ORAL ARGUMENT NOT YET SCHEDULED

**No. 25-5254**

═══════════════════════════════════

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
──────────────────────

AMICA CENTER FOR IMMIGRANT RIGHTS et al.,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF JUSTICE et al.,
Defendants-Appellees.

─────────────────────────────────────────

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-CV-00298-RDM
Before the Honorable Randolph D. Moss

─────────────────────────────────

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**
─────────────────────────────────

| GIBSON DUNN & CRUTCHER LLP | AMICA CENTER FOR IMMIGRANT RIGHTS |
|---|---|
| Amer S. Ahmed | Adina Appelbaum |
| Richard W. Mark | Samantha Hsieh |
| 200 Park Avenue | Amelia Dagen |
| New York, NY 10166-0193 | Amica Center for Immigrant Rights |
| (212) 351-4000 | 1025 Connecticut Avenue NW, Suite 701 |
| | Washington, DC 20036 |
| Laura M. Sturges | (202) 331-3320 |
| Caelin Moriarity Miltko | |
| 1900 Lawrence Street, Suite 3000 | |
| Denver, CO 80202-2211 | |
| (303) 298-5700 | *Attorneys for Plaintiffs-Appellants* |

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

    **A.    Parties and Amici.**  Amica Center for Immigrant Rights, American Bar Association, American Gateways, Charlotte Center for Legal Advocacy, Estrella Del Paso, Florence Immigrant and Refugee Rights Project, Immigration Center for Women and Children, Immigration Services and Legal Advocacy, National Immigrant Justice Center, Northwest Immigrant Rights Project, Pennsylvania Immigration Resource Center, and Rocky Mountain Immigrant Advocacy Network are the Providers—Plaintiffs in the district court and the Appellants in this Court. The United States Department of Justice, the Executive Office for Immigration Review, the Department of Homeland Security, Pam Bondi in her official capacity as Attorney General of the United States, Sirce E. Owen in her official capacity as Acting Director of the Executive Office for Immigration Review, and Kristi Noem in her official capacity as Secretary of Homeland Security are the Defendants in the district court and the Appellees in this Court.  Former Judges & Former Members of the Board of Immigration Appeals and Harris County, Texas, appeared in the district court as an amicus curiae in support of the Plaintiffs-Appellants.

**B.    Ruling Under Review.**  This action challenges the July 6, 2025 order and opinion of the district court partially granting the Government's motion for summary judgment, denying Providers' motion for summary judgment, denying Providers' motion for a preliminary injunction, and dismissing Providers' remaining claims for lack of subject matter jurisdiction.  Memorandum Opinion, *Amica Center for Immigrant Rights v. U.S. Department of Justice*, No. 25-298 (D.D.C. July 6, 2025) (Moss, J.), Dkt. 83; Order, Dkt. 84.  The district court's opinion does not yet have a Federal Reporter citation, but it is publicly available at 2025 WL 1852762.

**C.    Related Cases.**  Counsel are unaware of any related case involving substantially the same parties and the same or similar issues.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellants certify that as of this date, there is no conflict or interest to report.

# TABLE OF CONTENTS

**Page**

INTRODUCTION...........................................................................................1

JURISDICTIONAL STATEMENT ............................................................5

STATEMENT OF THE ISSUES.................................................................5

STATUTES...................................................................................................6

STATEMENT OF THE CASE ....................................................................6

I.    The Orientation Program was a long-running, successful
      program. ...........................................................................................6

II.   EOIR has expanded the Orientation Program's services over
      time.....................................................................................................8

III.  Congress appropriated money to the Orientation,
      Custodians, and Helpdesk Programs for fiscal years 2024
      and 2025. ..........................................................................................9

IV.   The Government terminated the statutory programs without
      providing a rationale. ....................................................................12

      A.    First attempt:  Stop Work Order. .........................................13

      B.    Second attempt:  termination and rescission. ......................15

      C.    Third attempt:  termination for convenience. ......................16

V.    The Government purports to introduce an alternative
      "federalized program."...................................................................17

VI.   Termination of the Programs had immediate impacts on
      Providers, interfering with their operations and missions. ..........20

VII.  Decision Below ................................................................................23

STANDARD OF REVIEW.........................................................................25

iv

SUMMARY OF ARGUMENT ..................................................26

ARGUMENT .......................................................................29

I.   The district court improperly relied on the purported
     "federalized program" to dismiss Providers' claims. ...................29

     A.   The district court erred in relying on the Government's
          post-hoc justifications while denying Providers' request
          to test their validity. .............................................30

     B.   The district court's reliance on the purported "in-
          sourcing" affected the whole of its analysis.........................37

II.  Providers have standing to challenge the decision to replace
     the decades-old contractor system with a hollow "federalized
     model." .........................................................................40

     A.   Providers suffered injury through harm to their
          organizational missions. .......................................41

     B.   The funding cutoff injured Providers. ...................................51

III. The Tucker Act did not divest the district court of
     jurisdiction over Providers' claims...............................................53

     A.   Section 1491(b) does not apply because Providers do not
          challenge a procurement decision.......................................55

     B.   Section 1491(a) does not apply because Providers' claims
          do not arise from contract or seek contractual relief. ..........60

IV.  The termination of the Helpdesk Program is not a
     discretionary decision beyond judicial review. ...............................63

V.   Should proceedings in the district court continue, a
     preliminary injunction is warranted. ...........................................69

CONCLUSION ......................................................................70

ADDENDUM OF PERTINENT STATUTES ........................................74

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ............................................................. 42

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986) ............................................................. 44

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
770 F. Supp. 3d 121 (D.D.C. 2025) ................................................. 52, 53

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) ......................................................... 41, 51

*Am. Gateways v. U.S. Dep't of Just.*,
2025 WL 2029764 (D.D.C. July 21, 2025) .................................... 44, 61

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................................. 32

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ....................................................................... 53, 62

*Collins v. Yellen*,
594 U.S. 220 (2021) ............................................................................. 52

*Crocker v. United States*,
125 F.3d 1475 (Fed. Cir. 1997) .......................................................... 54

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ........................................................... 61

*Ctr. for Biological Diversity v. United States Dep't of the Interior*,
  2025 WL 1933680 (D.C. Cir. July 15, 2025)................................. 42, 50

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019).............................................................. 36

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024)............................................... 38

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018).............................................. 50

*Emery Worldwide Airlines, Inc. v. United States*,
  264 F.3d 1071 (Fed. Cir. 2001) ........................................... 55

*End Citizens United Pac v. FEC*,
  69 F.4th 916 (D.C. Cir. 2023).............................................. 33

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994) ............................................. 46

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024).................................... 42, 46, 48, 49, 50

*Fisher-Cal Indus., Inc. v. United States*,
  839 F. Supp. 2d 218 (D.D.C. 2012) .................................... 58

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ............................................ 29

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)................................................ 38, 41, 42

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ............................................ 35

*Hispanic Affairs Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ............................................ 34

vii

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ............................................................ 25

*Human v. Czech Republic-Ministry of Health*,
   824 F.3d 131 (D.C. Cir. 2016) ........................................................... 25

*Int'l Union, United Auto., Aerospace & Agric. Implement*
   *Workers of Am. v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ........................................................... 68

*J.G.G. v. Trump*,
   2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ..................................... 65

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
   56 F.3d 279 (D.C. Cir. 1995) ............................................................. 62

*Labat-Anderson, Inc. v. United States*,
   346 F. Supp. 2d 145 (D.D.C. 2004) ................................................... 59

*League of United Latin Am. Citizens v. Exec. Off. of Pres.*,
   2025 WL 1187730 (D.D.C. Apr. 24, 2025) ........................................ 43

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................... 25, 69, 70

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................... 63

*Make the Road New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ........................................................... 33

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ......................................................... 70

*Megapulse v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ........................................................... 61

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................... 69

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ......................................... 40, 42, 46, 51

*Prakash v. Am. Univ.*,
   727 F.2d 1174 (D.C. Cir. 1984) ............................................... 29, 30, 31

*Quintero v. Garland*,
   998 F.3d 612 (4th Cir. 2021) ............................................................. 31

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
   87 F.3d 1338 (D.C. Cir. 1996) .......................................................... 65

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) .......................................................... 43

*Santa Barbara Applied Rsch., Inc. v. United States*,
   98 Fed. Cl. 536 (2011) ...................................................................... 59

*Saratoga Dev. Corp. v. United States*,
   21 F.3d 445 (D.C. Cir. 1994) ...................................................... 36, 37

*Save Jobs USA v. Dep't of Homeland Sec.*,
   942 F.3d 504 (D.C. Cir. 2019) .......................................................... 25

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ............................................................. 3, 29, 32, 39

*Sw. Airlines Co. v. Saxon*,
   596 U.S. 450 (2022) .......................................................................... 64

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) .......................................................... 34

*Tinton Falls Lodging Realty, LLC v. United States*,
   800 F.3d 1353 (Fed. Cir. 2015) .............................................. 56, 57, 58

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) .......................................................... 62

ix

*United States v. Texas*,
  2025 WL 1836640 (5th Cir. July 3, 2025) .......40, 42, 43, 46, 47, 49, 50

*Vero Tech. Support, Inc. v. U.S. Dep't of Def.*,
  437 Fed. App'x 766 (11th Cir. 2011)...................................................59

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................69

**Statutes**

8 U.S.C. § 1232(c)(4) ...................................................................................9

28 U.S.C. § 1291 .........................................................................................5

28 U.S.C. § 1331 .........................................................................................5

28 U.S.C. § 1491(a)............................................................ 24, 54, 60, 61, 62

28 U.S.C. § 1491(b)......................6, 7, 8, 24, 25, 28, 54, 55, 56, 58, 59, 60

Consolidated Appropriations Act, 2019,
  Pub. L. 116-6, 133 Stat. 13 (2019) ................................................. 10, 64

Consolidated Appropriations Act, 2021, 117th Cong., H.R.
  133 / Public Law 116-260, 245 (Comm. Print 2021) ......................... 11

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260,
  134 Stat. 1182, 1185, 1264, 1276........................................................ 66

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42,
  tit. III, 138 Stat. 25, 133 (2024)................................... 2, 10, 12, 64, 66

Full-Year Continuing Appropriations and Extensions Act,
  2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025).................................. 12

**Other Authorities**

166 Cong. Rec. H7879 (Dec. 21, 2020) ....................................................66

170 Cong. Rec. S1398 (Mar. 5, 2024) .................................................. 11, 66

170 Cong. Rec. S1405 (Mar. 5, 2024) ...................................................... 12

H. Rep. 108-10 (2003) ............................................................................. 11

H. Rep. 116-101, 47 (2019) ...................................................................... 67

H. Rep. 116-455 (2020) ............................................................................ 11

S. Rep. 115–275 (2018) ............................................................................ 67

S. Rep. 116-127 (2019) ............................................................................ 67

S. Rep. 118-62 (2023) ................................................................ 2, 12, 66, 67

## Regulations

No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ......................................... 13

Executive Order 14222 ........................................................................... 15

Executive Order, "Protecting the American People from Invasion" ...... 13

# GLOSSARY

Acacia...............................................................Acacia Center for Justice

APA.........................................................Administrative Procedure Act

Custodians Program...............Legal Orientation Program for Custodians

DOGE...........................................Department of Government Efficiency

DOJ......................................................................Department of Justice

EOIR........................................Executive Office for Immigration Review

The Government.......................................................Defendants-Appellees

Helpdesk Program......................................Immigration Court Helpdesk

Orientation Program.....................................Legal Orientation Program

Programs......................Orientation, Helpdesk, and Custodians Program

Providers................................................................Plaintiffs-Appellants

TVPRA.....................Trafficking Victims Protection Reauthorization Act

## INTRODUCTION

This case is about whether the government can paper over a decision to terminate an outsourced, congressionally mandated program by claiming for the first time—weeks later and solely in response to a summary judgment motion—that it intends to resuscitate the program and run it in-house.  It cannot.  At minimum, when an agency submits such a post-hoc justification, plaintiffs are entitled to test its truthfulness through discovery.  The district court erred by premising its jurisdictional analyses (which are otherwise erroneous on their own) on that post-hoc justification without giving Plaintiffs-Appellants—the providers who ran the programs—the chance to disprove its veracity.

The programs at issue are the Legal Orientation Program ("Orientation Program"), Immigration Court Helpdesk ("Helpdesk Program"), and Legal Orientation Program for Custodians ("Custodians Program") (collectively, the "Programs").  Plaintiffs-Appellants ("Providers") are twelve non-profit legal services organizations which subcontracted to run those Programs by providing legal education services to individuals in removal proceedings.  Those services, which provide baseline due process for those in immigration detention facilities and facing removal, have

never been more vital, as increasing numbers of individuals are placed in immigration detention facilities.

Congress has earmarked appropriations for the Programs for decades, including in its most recent appropriations bill. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, tit. III, 138 Stat. 25, 133 (2024). And the Senate specified that the appropriated funds should go to "non-profit NGOs with demonstrated immigration law expertise." S. Rep. 118-62, at 85 (2023).

Nonetheless, in April, the Executive Office for Immigration Review ("EOIR") abruptly terminated its contract with the prime contractor with whom Providers subcontracted, directing the prime contractor "to terminate" the Programs. APP0222. Providers sued for an injunction to protect their organizational interest in the Programs' continuation and to ensure that, consistent with Congress's directives, the Programs continued to provide critical legal services to those in removal proceedings. Providers argued that the Government's decision to terminate the Programs violated the Administrative Procedure Act ("APA") both because it was contrary to law and arbitrary and capricious.

Defendants-Appellees ("the Government") conceded in oral argument below that the Government was required by law to spend funds on legal orientation services, the administrative record did not contain a justified reason for its decision to terminate the Programs, and it would be "*a difficult record to defend* under the arbitrary and capricious standard." APP0837–38, 851 (emphasis added). So, rather than attempt to defend its termination decision based on the administrative record, the Government pivoted, stating in response to Providers' motion for summary judgment that it was replacing the Programs with an ill-defined "federalized" program, which first purportedly covered all three Programs, but soon morphed into a supposed replacement for only two of them.

It is black-letter administrative law that courts can uphold agency action only based on the grounds the agency relied on when making its decision—agency action cannot be supported by post hoc justifications invented during litigation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Yet rather than disregarding the Government's belated justification for terminating the Programs—its purported intent to replace some of the Programs with an in-sourced program—the district court allowed the Government to smuggle in that post-hoc rationale by ordering the

3

Government to "supplement" the unarguably deficient administrative record. The district court then recast the termination of the Programs as a mere decision to "in-source" them—relying solely on extra-record, post-hoc declarations. And it did so without giving Providers any opportunity to test the Government's vague assertion that it intended to continue the Programs, even though the assertion is plainly pretextual and contrary to controlling law. That is not how challenges to administrative action are supposed to work.

Having rewritten Providers' claims to challenge not the Programs' termination, but instead their "in-sourcing" and the adequacy of the new program, the district court granted the Government summary judgment. It held that the Tucker Act strips it of jurisdiction over a challenge to the Government's decision to in-source the Orientation and Custodians Programs. The district court further held that Providers lack standing to challenge the adequacy of the Government's in-sourced program—despite the evidence that "in-sourcing" was simply termination by another name. And the district court held that the Government's conceded termination of the Helpdesk Program was an unreviewable discretionary action—despite it directly contradicting Congress's mandates. Each of

these independent legal errors stemmed from the court's erroneous reliance on the Government's post-hoc rationales.

This Court should reverse the district court's grant of summary judgment to the Government, and—given the Government's admission that it cannot defend its actions under the materials properly considered as part of the administrative record—remand with instructions to enter judgment for Providers.  In the alternative, because Providers have shown that they are likely to succeed and all other relevant factors weigh in their favor, the Court should remand with instructions to grant Providers' request for a preliminary injunction and to allow Providers to conduct discovery in support of their claims.

## JURISDICTIONAL STATEMENT

This appeal comes after final judgment as to all claims and parties and the Court has jurisdiction under 28 U.S.C. § 1291.  The district court had jurisdiction over this matter under 28 U.S.C. § 1331 because, as explained below, Providers have standing and the Tucker Act doesn't apply.

## STATEMENT OF THE ISSUES

**A.**  In dismissing Providers' claims, did the district court err in relying on extra-record, contradictory, and disputed declarations that the

Government offered to retroactively justify its termination of the Orientation and Custodians Programs?

**B.**  Did the district court err when it held Providers lacked standing to challenge the termination of the Orientation and Custodians Programs?

**C.**  Did the district court err in holding that 28 U.S.C. § 1491(b) bars Providers' claims as to termination of the Orientation and Custodians Programs?

**D.**  Did the district court err in holding that the decision to terminate the Helpdesk Program was immune from judicial review?

**STATUTES**

Pertinent statutes, regulations, and treaties are reproduced in the addendum.

**STATEMENT OF THE CASE**

## I.    The Orientation Program was a long-running, successful program.

The precursor to the Orientation Program began over 30 years ago, when private non-profit organizations, including the Florence Immigrant and Refugee Rights Project (the "Florence Project"), developed legal orientation programs and "Know Your Rights" presentations.  APP0511.

6

These original programs and presentations encouraged noncitizens in de-
tention to actively participate in their cases and provided access to the
accurate legal information needed to make informed decisions. *Id.* A
1992 General Accounting Office report found they saved "a significant
amount of time" by "eliminat[ing] the need to have immigration judges
describe the various types of relief available to each alien during the
hearings." APP0338.

Recognizing the success of these private programs, the Senate in
1994 passed a bipartisan resolution recommending the creation of a pilot
program based on the Florence Project model, aimed at "increasing effi-
ciency and cost savings." *Id.* EOIR found the program led to substantial
efficiencies, including a nearly 20% reduction in detention time. *Id.*

The modern Orientation Program began in 2003, when Congress
appropriated $1 million for EOIR to expand the successful pilot program
to six sites. Since then, Congress has repeatedly funded the "services and
activities provided by the Legal Orientation Program" over a period span-
ning more than two decades and four presidents. APP0338, 511. Before
its termination, the Orientation Program provided four services at deten-

7

tion facilities: (1) group orientations giving an overview of removal proceedings and forms of relief; (2) individual orientations for unrepresented individuals to discuss their cases with Orientation Program providers; (3) self-help workshops providing guidance and materials both to those with potential avenues for relief and to those willing to voluntarily depart the country; and (4) referrals to pro bono legal services, when available. APP0339.

Repeated evaluations of the Orientation Program yielded unambiguously positive results. *Id.* For example, in November 2017, the ICE Assistant Director for Custody Management wrote a memorandum to ICE field officers, stating, "[e]xperience has shown that [Orientation Program] attendees are positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detainees who have not received the" Orientation Program. APP0340–41.

## II. EOIR has expanded the Orientation Program's services over time.

EOIR acted on congressional instruction to build on the Orientation Program's success by creating other legal access programs, including the Custodians and Helpdesk Programs. EOIR launched the Custodians

8

Program in 2010 to provide legal orientations to adult "custodians" caring for unaccompanied noncitizen children separated from their parents or other caregivers. APP0339. This program also effectuates Congress's command to provide such orientations in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"). *Id.* (citing 8 U.S.C. § 1232(c)(4)).

In 2016, Congress provided EOIR with funding to create Helpdesk Programs "at the immigration courts with the greatest pending caseload." APP0339–40*; see also* APP0020 (recognizing that the Helpdesk Program was launched "with specific funding from Congress"). The Helpdesk Programs—legal education programs for individuals in immigration proceedings who are not in detention—provided information about court practices and procedures, legal options, and other relevant topics, ensuring a modicum of due process for unrepresented noncitizens navigating a complex, high-stakes legal system.

## III.  Congress appropriated money to the Orientation, Custodians, and Helpdesk Programs for fiscal years 2024 and 2025.

Since 2003, Congress has continually funded the Programs, either through express language in appropriations bills, in the congressional

9

record, or in congressional reports.  Since 2019, Congress has earmarked funds for the "services and activities provided by the Legal Orientation Program."  Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13, 102 (2019).  In 2019 (as now), those "services and activities" included the Orientation Program, the Custodians Program, and the Helpdesk Program.  Rather than leaving it to EOIR's discretion to determine how the Programs should be structured and operated, Congress has repeatedly used its power of the purse to dictate aspects of what the Programs should encompass.

In particular, Congress provided additional operational guidance for the Programs in both the accompanying joint explanatory statement and House and/or Senate Reports.  In appropriations statutes, Congress routinely incorporates the joint explanatory statement and requires agencies to notify Congress prior to eliminating funds for any programs identified in the appropriations statute, the joint explanatory statement, or the most recent Senate or House Report. *See, e.g.*, 138 Stat. at  26, 154, 167.  The joint explanatory statement, in turn, typically incorporates the

latest Senate or House Report, similarly requiring notice to Congress before terminating funds for programs identified in the report. *See, e.g.*, 170 Cong. Rec. S1398 (Mar. 5, 2024).

Through the Senate and House Reports, Congress provided direction as to how monies for the "services and activities provided through the Legal Orientation Program" are to be spent. For example, Congress began funding the Orientation Program in 2003 with an instruction "for non-governmental agencies to provide 'live presentations' to persons in INS detention." H. Rep. 108-10 at 625 (2003). In 2021, Congress directed that the Orientation Program continue to be "operated by non-profit NGOs with demonstrated immigration law expertise." Consolidated Appropriations Act, 2021, 117th Cong., H.R. 133 / Public Law 116-260, 245 (Comm. Print 2021). And Congress "remind[ed] EOIR that funding for this program, *in its ongoing, in-person format, is mandated by law*, and any diversion of these funds from their intended purpose must be formally communicated and *convincingly justified* to the Committee." H. Rep. 116-455 at 63 (2020) (emphases added).

On March 9, 2024, as it has done every year since 2003, Congress appropriated funds, providing that "not less than $28,000,000 shall be

available for services and activities provided by the Legal Orientation Program." 138 Stat. at 133. At that time, Congress "direct[ed] the Department [of Justice] to utilize all appropriated funds solely for legitimate program purposes." 170 Cong. Rec. S1405 (Mar. 5, 2024). The Senate Report reminded EOIR of Congress's continued support of the Orientation Program, "which was created in 2003 and currently informs more than 50,000 detained non-citizens per year about their legal rights and responsibilities in immigration court." S. Rep. 118-62 at 84 (2023). It further directed that at least $5 million be spent on the Helpdesk Program. *Id.* at 85.

In early 2025, Congress extended its 2024 appropriations and continued funding (including for the Programs) at 2024 levels through at least September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025).

## IV. The Government terminated the statutory programs without providing a rationale.

Notwithstanding Congress's mandates and the demonstrated effectiveness of the Programs, the Government acted to terminate them three times.

12

## A.     First attempt:  Stop Work Order.

On January 22, 2025, DOJ/EOIR issued an indefinite Stop Work Order as to all Programs other than the Custodians Program.  APP0168.  The Stop Work Order referenced an Executive Order, "Protecting the American People from Invasion," which instructed agencies to review federal funding to non-governmental agencies providing services to immigrants to ensure agreements "are free of waste, fraud, and abuse."  Proclamation No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025).  Providers filed suit shortly thereafter, challenging the Stop Work Order and simultaneously moving for a preliminary injunction.[1]  Dkts. 1, 2.[2]

Less than two weeks after issuing the Stop Work Order (and two days after Providers filed suit), the Government reversed course and reinstated funding.  APP0174.  But four days later, Attorney General Bondi issued a memorandum directing DOJ and EOIR to "pause" funding the

---

[1] Providers also challenged the termination of two other programs:  the Family Group Legal Orientation Program and the Counsel for Children Initiative.  Providers are not appealing the district court's judgment with respect to those programs.

[2] All docket cites are to the district court docket.

Programs, purportedly to review them for "waste, fraud, or abuse."
APP0003.

On February 21, 2025, the Government filed its first administrative
record related to the Stop Work Order.  It contained no mention of a plan
to federalize the Programs.  During litigation, the Government cited the
Attorney General's memorandum as a potential justification for termi-
nating the Programs.  Dkt. 35 at 20 n.8.  On March 17, the district court
held a hearing on Providers' motion for a preliminary injunction.  Minute
Entry, Mar. 17, 2025.  With the Programs reinstated, the district court
ordered the Government to provide at least three business days' notice to
Providers before taking any further action to pause or terminate the Pro-
grams.  Minute Order, Mar. 17, 2025.  Shortly thereafter, the Govern-
ment filed a status report with the district court, stating EOIR was "com-
piling and reviewing certain information from recipients of Department
of Justice funding in accordance with . . . the February 5, 2025 memoran-
dum issued by the Attorney General."  APP0193.  This status report made
no mention of any plan to federalize or in-source the Programs.  The Gov-
ernment later provided a post-termination declaration stating that the
memorandum was *not* the basis for termination.  APP0243–45.

**B.     Second attempt:  termination and rescission.**

On April 4, the Government again acted to terminate the Programs. Despite the district court's order requiring three days' notice before termination, Providers, through the prime contractor Acacia Center for Justice ("Acacia"), received a notice terminating the Acacia contract, stating that DOJ "determined that the services are no longer needed."  APP0211.

The second attempted termination did not rely on the Protecting the American People from Invasion Executive Order or the February 5, 2025 Attorney General memorandum.  Instead, it purportedly relied on Executive Order 14222, Implementing the President's Department of Government Efficiency ("DOGE") Cost Efficiency Initiative.  APP0205.

Sirce Owen, Acting Director of EOIR, admitted she did not know the reason for the termination.  APP0212.  Instead, she stated that "DOGE contacted JMD [Justice Management Division] this afternoon and instructed them to terminate the contract" and that "whoever [DOGE] spoke to . . . [knew] the basis for the termination." *Id.*  The administrative record revealed only that a DOGE staffer had pushed to quickly terminate the contract because he wanted to "report completion to WH."  APP0208.

15

After recognizing the April 4 termination violated the district court's order requiring three days' notice, the Government rescinded it. APP0217.

### C.    Third attempt:  termination for convenience.

After the failed April 4 termination, the DOGE staffer described the district court's order requiring three-days' notice as an "easy fix." APP0218.  Accordingly, DOJ issued a new termination notice, this time with a three-business-day notice period, on April 10.  The April 10 notice terminated the Programs' prime contract "for the convenience of the government," effective April 16, 2025.  APP0234.

On the day it was sent, a Justice Management Division employee wrote EOIR:  "We need to know why does EOIR want these task orders terminated?  Please provide a memo in writing ASAP." APP0231.  Rather than provide a memo or any reasoning, EOIR simply instructed Justice Management Division to issue notices directing Acacia "to *terminate*" each of the Programs.  APP0222 (emphasis added); *see also* APP0219 (listing recommendations for Programs' "termination").

That day, Providers notified the district court of their intention to re-file for a temporary restraining order.  APP0195.  The district court

16

denied Providers' request, but set an expedited briefing schedule for Providers' request for a preliminary injunction and invited the parties to brief motions for summary judgment. Minute Order, April 15, 2025. On April 24, 2025, the Government filed its second administrative record related to the termination of the Programs. Aside from a stray reference suggesting a federal program to replace the Custodians Program, nothing in this second administrative record discussed a plan to federalize these Programs. The parties agreed to brief summary judgment motions based on the February and April administrative records, with Providers filing their motion first and the Government simultaneously filing its opposition and cross-motion. Dkt. 66.

## V. The Government purports to introduce an alternative "federalized program."

On May 9, in response to Providers' summary judgment motion, the Government introduced—for the first time, and almost a month after termination—a description of a purported "federalized program" to replace the Programs, including the Helpdesk Program. APP0651–52. The "federalized program," introduced only in this litigation and not reflected in any agency documents, stripped away core orientation services the Programs provided, listed as a replacement preexisting resources that are

17

separate from the Programs' services, and expressly excluded "legal advice [or] representation." APP0652. The purported program is to be "administered by a team of EOIR employees including the Immigration Judge corps." *Id.* It "will include Immigration Judges orienting [noncitizens] to their rights, obligations, and available legal options" and will include "hard copy and online legal tools such as self-help legal materials and EOIR's Immigration Court Online Resource (ICOR)." *Id.* These resources were already independently required and existed apart from and alongside the Programs for years. APP0680–81; APP0702–04.

Neither the original nor the supplemented administrative record contains any plan for a "federalized program." And the Government's description of the federalized program changed significantly across its litigation filings submitted after that record. The May 9 declaration included the Helpdesk Program among the programs to be "federalized." But a second declaration, filed twelve days later in response to a court order to supplement the record, stated that the Helpdesk Program was terminated and would not be continued, even in a "federalized" program. Similarly, although immigration-judge advisals are mentioned in the

first declaration, they are absent from the second declaration, which refers instead only to group presentations for custodians, self-help materials, "potential outreach" to custodians, and online resources for all other individuals in removal proceedings—resources that are of virtually no use to detained individuals given their lack of Internet access. APP0703–04.

The declarations describe the purported federalized plan in future terms, while also describing resources that already exist, including immigration judge advisals and hard copy and online self-help materials. APP0652, 916–17. The Government has provided no evidence that any additional programming will occur, nor explained when such programming will be in place, staff that will be hired to run it, or training materials that are being developed. *See generally* APP0650–54, 911–18. Indeed, Providers understand that some of these existing materials are actually being *removed* from detention facility libraries. APP0400. The Government likewise presented no evidence that the "federalized program" went through any agency review, and the Government has not ex-

19

plained whether it considered the data to examine whether such a pro-

gram would be effective or feasible, let alone whether it could meet the

requirements of the appropriations legislation for the Programs.

## VI.   Termination of the Programs had immediate impacts on Providers, interfering with their operations and missions.

Since the termination, and in direct response to the loss of funding,

many Providers have been increasingly forced to furlough or lay off many

of their staff.   *See* APP0387; APP0393–94; APP0399; APP0503–04;

APP0558; APP1165.

Beyond these operational harms, termination of the Programs has

frustrated Providers' missions to support noncitizens in removal proceed-

ings.   Absent effective versions of the Programs, more noncitizens are

navigating the immigration system without any background on the im-

migration process, their obligations, or the legal remedies available to

them.  *See, e.g.*, APP0388 (increased difficulties for individuals in deten-

tion centers due to the lack of Program resources); APP0544 (increased

need for Helpdesk Program services); APP0563 (similar); APP1169–70

(similar).

Termination of the Programs has directly affected Providers' ability

to fulfill their missions.  For example, ProBAR has not been allowed to

20

provide Helpdesk Program group orientations at the Harlingen Immigrant Court after the court administrator denied its request "based on recent changes in the contracts."  APP0394*; see also* APP0383; APP0506; APP0539; APP0551.  For ProBAR, "[t]he termination of [the Programs] has frustrated all three pillars of [its] mission:  high-quality legal information, representation, and connection to services," including by restricting its ability to provide referrals to pro bono representation and to connect to sponsors and families for unaccompanied children.  APP0394.  Likewise, following termination, the South Texas Detention Complex is no longer allowing its library to contain materials that are not written in English, including materials provided by American Gateways.  *See* APP0400; *see also* APP0557–58 (pro se materials may no longer be available at Moshannon Valley).  And RMIAN has been able to arrange only individual consultations, resulting in a 90% reduction in the scope of the organization's outreach.  APP0570–71.

The termination has also interfered with Providers' other core business activities to provide legal services to noncitizens apart from the Programs.  The record shows that, after the termination, the Government

stopped sharing information with Providers regarding docket lists for individuals, including children, with upcoming court appearances and rosters for individuals in detention facilities.  *See* APP0394; APP0495–96; APP0518–20; APP0533–34; APP0539; APP0551; APP0557; APP0563–64; *see also* APP1157–60; APP0571–72.  These rosters were critical to Providers' ability to identify those detained and facing removal proceedings, which allowed Providers to request to meet with and successfully contact individuals.  Providers could then conduct orientation services and connect these individuals with outside resources, including know-your-rights education, objective legal information, pro bono counsel or family members.  Additionally, the termination of the Programs (and lack of any viable alternative) limits Providers' ability to refer individuals to qualified pro bono counsel as needed, further limiting their ability to fulfill their missions.  *See, e.g.*, APP0382; APP0394; APP0502; APP0518–19; APP0562; APP0568.  Providers report that the lack of interpretation services limits the ability to provide mission-critical services.  *See, e.g.*, APP0387.  And the termination has further drained critical resources, taking staff from other mission-based services.  *See, e.g.*, APP0534.

22

Providers are not aware of any alternative programming that has occurred to take the place of their prior services; *see, e.g.*, APP0400, and the Government has not identified any.

## VII. Decision Below

The district court denied Providers' preliminary injunction motion and motion for summary judgment and granted summary judgment for the Government.  APP1211.  As a starting point, the district court rejected Providers' arguments that the extra-record declarations submitted by the Government were not properly before it.  APP1189–90.  The district court held that, although it ordinarily may not review post-decision, extra-record materials, it could consider these declarations because they related to whether the Court had subject-matter jurisdiction and whether Providers stated a cause of action.  *Id.*

Next, relying on the extra-record declarations, the district court recast the agency's decision to terminate the Programs as two different actions:  (1) the "in-sourcing" of the Programs; and (2) their ongoing "administration."  APP1190.  The court held that Providers have standing to challenge the "in-sourcing" of the Orientation and the Custodians Pro-

23

grams. APP1192. But the court held that creating the federalized program for the terminated Orientation and Custodians Programs was "a procurement decision that falls within the Tucker Act's jurisdictional sweep," thus divesting the district court of jurisdiction over the claim, APP1195, despite this purported "decision" coming months after Providers brought this litigation challenging the Programs' termination.

The district court then held Providers lacked standing to challenge the adequacy of the federalized programs because the Government's decisions as to how to run the purported federalized program did not have any direct financial effects on Providers. APP1207–10. The court did not address Providers' organizational and mission harms.

Finally, the district court held that Providers had standing to challenge the termination of Helpdesk Program, and neither 28 U.S.C. § 1491(a)(1) nor 28 U.S.C. § 1491(b) barred review. Nonetheless, the district court held the Helpdesk Program termination was not subject to judicial review because "EOIR has discretion to discontinue its use of earmarked funds for that specific program." APP1200. In particular, the district court held that the Government was not bound to carry out the Senate Report's direction to spend funds on the Helpdesk Program as

24

part of the "services and activities provided by the Legal Orientation Program." *Id.*

This appeal followed.

## STANDARD OF REVIEW

This Court reviews summary-judgment orders dismissing cases for lack of subject-matter jurisdiction, including lack of standing, de novo. *Human v. Czech Republic-Ministry of Health*, 824 F.3d 131, 134 (D.C. Cir. 2016) (subject-matter jurisdiction); *Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d 504, 508 (D.C. Cir. 2019) (standing).

In preliminary-injunction appeals, this Court reviews legal issues de novo, factual findings for clear error, and the district court's weighing of the four preliminary injunction factors for abuse of discretion. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726–27 (D.C. Cir. 2022). When, as here, the district court did not reach all factors, this Court may "independently grant an injunction after considering the proper factors." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

## SUMMARY OF ARGUMENT

**I.** Providers moved for summary judgment based on the two administrative records filed by the Government at that point. These records show that the Government *terminated* the Programs with no plan to continue them. But in response to Providers' motion for summary judgment, the Government submitted—for the first time—an extra-record declaration claiming it planned to "federalize" the Programs, without any reference to materials showing that such a plan had been made or existed at the time the Government terminated the Programs. Two weeks later, the Government changed course again, claiming it planned to federalize only the Orientation and Custodians Programs.

Providers disputed the Government's post-hoc declarations and asked for discovery if the district court were to consider crediting the Government's claim that a federalized program was forthcoming. Ignoring Providers' arguments showing the inadequacy of the administrative record on the "federalized program," the district court found that the Government had set up or intended to set up such a program and relied on that finding to hold it lacked jurisdiction to consider Providers' claims as to the Orientation and Custodians Programs. With insufficient evidence

26

and without making a clear factual finding (which would lack a factual basis), the district court considered these extra-record declarations and treated the post-termination proposal for a federalized program as if an actual program had been made. It then failed to give Providers the opportunity to make a record on this material issue. This was reversible error.

**II.** The district court also erred by concluding that Providers lacked standing to challenge the federalization of the Orientation and Custodians Programs, despite holding Providers had standing to challenge the "in-sourcing" of the Orientation and Custodians Programs. In doing so, the district court ignored Providers' well-established mission harms and focused solely on Providers' financial harms. But Providers submitted clear evidence of how the termination or purported federalization of the Orientation and Custodians Programs directly harmed their core business activities, both in impeding Program services and impeding other mission critical activities Providers conduct alongside the Programs.

**III.** Focusing solely on Providers' financial harms, the district court also misconstrued Providers' claims as to the Orientation and Custodians Programs as a procurement challenge and held that it lacked jurisdiction

27

to consider such claims under 28 U.S.C. § 1491(b)—a provision not raised by any party or the court in this litigation until the order on appeal. But Providers do not seek an order compelling the Government to contract with anyone, nor do they seek to compete for a contract. Instead, they seek an order requiring the Government to continue congressionally mandated Programs. The district court erred by misconstruing Providers' claims and dismissing for lack of subject-matter jurisdiction.

**IV.** The district court correctly held it had jurisdiction to consider Providers' claims as to the termination of the Helpdesk Program, but erroneously concluded its termination was unreviewable under the APA. In so doing, the district court gave short shrift to the Senate Report's clarification of otherwise ambiguous language regarding what constitutes the "services and activities provided by the Legal Orientation Program" and relied on inapposite caselaw. Accordingly, the district court erred in concluding that the Government had wholesale discretion to terminate the congressionally mandated Helpdesk Program.

**V.** Because the district court dismissed Providers' claims, it did not consider Providers' request for preliminary injunctive relief. Should this

28

Court remand to the district court for further proceedings, it should instruct the district court to grant Providers' request for preliminary injunctive relief because all factors favor such relief here.

## ARGUMENT

### I.     The district court improperly relied on the purported "federalized program" to dismiss Providers' claims.

When dismissing a case for lack of subject-matter jurisdiction, the district court must view the facts in the light most favorable to the plaintiff. *Haase v. Sessions*, 835 F.2d 902, 904 (D.C. Cir. 1987). Further, it is black-letter law that a court's review of an administrative decision is limited to the record before the agency at the time of the decision. *See Chenery Corp.*, 318 U.S. at 87. Notwithstanding these bedrock principles, the district court accepted as true disputed, extra-record declarations that provided after-the-fact justifications for the termination of the Programs—justifications that were both internally contradictory and obviously contradicted by the actual written record. The district court did not address Providers' arguments about those declarations, then used those disputed declarations to determine subject-matter jurisdiction and dismiss Providers' claims. That was reversible error. *See Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984). Because the district

29

court's reliance on the disputed declarations permeated the whole of the district court's analysis, this Court should reverse.

### A. The district court erred in relying on the Government's post-hoc justifications while denying Providers' request to test their validity.

When the Government decided to terminate the Programs in April, there was no indication it intended to federalize any of the Programs. Apart from a single stray reference to a suggested federalized program to replace the Custodians Program after a thirty-day notice period, APP0219, the administrative record contained no explanation or plan for a federalized program and no evidence that any such program was actually in the works. Indeed, the stray mention of only the Custodians Program underlines that the Government had no plan to replace the Orientation or Helpdesk Programs. *Id.*

It was not until the Government filed its opposition to Providers' summary judgment motion that it submitted an extra-record declaration from acting EOIR Director Owen stating for the first time the Government's intent to create a consolidated federalized program to replace the Programs. APP0652. Owen's declaration stated that the federalized program would consist of immigration judge advisals as well as existing

30

hard-copy and online self-help materials provided through programs like EOIR's Immigration Court Online Resources. *Id.*

At argument, the Government admitted it was "not in a position to represent" what the "federalized program" would actually entail. APP0844. While asserting that the Government would satisfy the statutory obligation to "spend certain money on the Legal Orientation Program," counsel fell back on the Owen declaration—which pointed to conducting the Programs largely through existing staff like immigration court judges. *Id.* But immigration judges already "have an affirmative duty to assist and work with" individuals appearing before them, so it is not clear how the purported federalized program would provide anything additional to that preexisting obligation.[3] *Quintero v. Garland*, 998 F.3d 612, 626 (4th Cir. 2021). Likewise, to the extent the federalized program relies on online materials, APP0652, those materials also already exist and were created to supplement the Programs—not replace them, APP0679–81, 700–08. It is implausible that the Government could meet

---

[3] Congress mandated the Programs *after* courts obligated immigration judges to provide such advisals. The purported federalized program is the Government refusing to do the additional work and provide the additional services that Congress has directed.

its statutory obligation to spend millions of dollars in appropriated money on immigration staff it already pays and self-help materials it already provides. APP0652. Whether called "termination" or "federalization," the Government is refusing to do what Congress directed.

The fact that the Owen declarations contradicted the administrative record, alone, should have been enough to dispose of this issue. For almost a century, it has been black-letter law that the "grounds upon which an administrative [decision] must be judged are those upon which the record discloses that its action was based." *Chenery*, 318 U.S. at 87. So, even when the government offers a "supplemental explanation" outside of the administrative record, that explanation must be "anchored to 'the grounds that the agency invoked when it took the action'" at issue. *Biden v. Texas*, 597 U.S. 785, 811 (2022).

Here, the Government *never* indicated it was invoking the grounds of "in-sourcing" the Programs when it cancelled the contracts through which Providers fulfilled Congress's mandates. To the contrary, the administrative record makes plain that the Government understood it was effecting a "termination" of the Programs—a term used dozens of times

32

across the administrative record. *See, e.g.*, APP0217–20, 222. The Government's post-hoc invocation of "in-sourcing" and "federalization" finds no support in the administrative record, and the district court's reliance on those post-hoc justifications falls afoul of *Chenery*.

The district court tried to write around this issue by saying that it was "not limited to the administrative record in determining whether it has subject matter jurisdiction." APP1190. But none of the cases it cited suggest that courts can perform an end-run around *Chenery* simply by characterizing agency action as going to jurisdiction, rather than the merits, of an APA claim, nor do they suggest the Government may retroactively justify its decision through made-for-litigation declarations. *See, e.g.*, *End Citizens United Pac v. FEC*, 69 F.4th 916, 921–22 (D.C. Cir. 2023) (prohibiting consideration of such declarations).

The district court's reliance on *Make the Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020), does not help, as that case merely held the agency did not need to create a record through notice-and-comment rulemaking when the challenged decision was discretionary. *Id.* at 634. And the other cases cited by the district court address when a *plaintiff* may bring in extra-record facts and say nothing about when the *Government*

33

may, on its own initiative, belatedly submit such facts.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (refusing to consider a plaintiff's extra-record evidence); *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018) (same). Those cases confirm that looking outside the administrative record "is the exception, not the rule," and is allowed only where "the record is so bare that it prevents effective judicial review."  *Theodore Roosevelt*, 616 F.3d at 514; *see also Hispanic Affairs Project*, 901 F.3d at 386 n.4.  The record here does not prevent effective review—rather, it makes clear that the Government intended to terminate, rather than "in-source" or "federalize," the Programs.  APP0217–22.

To the extent the Government's decision was not clear from the administrative record, Providers requested the opportunity for discovery about the Government's bare-bones and post-hoc announcement of a federalized program.  *See* APP0679 (asking for "an opportunity to conduct discovery regarding this newly announced program"); APP0681 (same). But instead, the district court ordered the Government to produce a *third* administrative record to support the Owen declaration.  APP0797–800.

34

The Government's third record created even more questions.  A second Owen declaration contradicted the first, asserting that the purported federalized program would replace only the Orientation and Custodians Programs—not the Helpdesk Program—and would consist only of group presentations for custodians, self-help materials, "potential" outreach to custodians, and online resources like the Access EOIR website.  APP0917.  It contained no correspondence or internal documents suggesting any federalized program was in the works.

Ignoring these glaring inconsistencies and the fact that "federalization" was not supported by any other record evidence, the district court relied on the contradictory Owen declarations to implicitly find that a federalized program exists, and thus split Providers' claims into those challenging the "decision to in-source" the Programs and those challenging the "administration of federalized" versions of the Programs.  APP1191, 1207.  The district court nonetheless did not provide "an explicit explanation of its findings," and thus erred in holding Providers lacked standing based on "its own resolution of disputed facts."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197–98 (D.C. Cir. 1992).

35

At a minimum, the district court should have allowed Providers to seek discovery into the late-breaking "federalized" plan. Such discovery by plaintiffs is allowed in APA cases where there has been "bad faith or improper behavior" such that "without discovery the administrative record cannot be trusted." *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458 (D.C. Cir. 1994); *see also Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019) (reviewing extra-record evidence when the agency's explanation did not match the evidence). That is exactly the situation here. The Government admitted it has a "a difficult record to defend," APP0851, and so it tried to supplant that clear record with a post-hoc rationale that was *never* mentioned at the time the Programs were terminated. Yet even then, all the Government offered was a cobbled-together description of preexisting materials and obligations, none of which could plausibly fulfill Congress's objectives for which it appropriated millions of dollars. That kind of behavior warrants discovery to test whether the post-hoc declarations "can[] be trusted." *Saratoga*, 21 F.3d at 458.[4]

---

[4] Any order directing the district court to allow discovery should encompass discovery relevant to Providers' First Amendment claims, too. In fact, Providers notified the district court that they were planning to provide additional, updated factual support for their First Amendment claim,

**B.  The district court's reliance on the purported "in-sourcing" affected the whole of its analysis.**

As the district court candidly admitted, it relied on "extra-record evidence in the form of the Government's after-the-fact claim that it was "federalizing" the programs to determine the "nature of the agency actions at issue"—ultimately concluding that the Government had "in-source[d]" the Programs and that the Owen declarations described its "ongoing implementation and administration of its new, federalized" Programs.  APP1191.  The court then separated the "decision to in-source" from the "ongoing implementation" and addressed them "in turn" as distinct agency actions, *id.*, ultimately coming to different conclusions on issues of standing and jurisdiction as to the two actions.

The artificial division created by the district court mischaracterized Providers' claims, which always focused on one action:  the Government's termination of the Programs.  Once corrected, Providers' standing to challenge the entirety of the Government's actions with respect to the Programs becomes clear.  The Government's actions have directly interfered

---

Dkt. 82 at 2, which the district court could not address in its order, contributing to the district court's flawed First Amendment analysis dismissing this claim.

with Providers' core business activities, forcing them to reduce the services they may provide to those in removal proceedings (both through the Programs and outside them). These harms are not contractual, but instead flow from the failure to implement the Programs at all. Providers' harms would be remedied, at least partially, if the Government actually found an alternative method to effectively implement the Programs.

The district court first analyzed the "wholesale termination" of the Helpdesk Program and decision to allegedly "in-source" the other Programs, correctly determining that Providers had standing to challenge those decisions. APP1191–93, 1196–97. But the district court's analysis went awry when it then improperly split the decision to "in-source" the Programs from the litigation position to allegedly "federalize" those programs. APP1191, 1207–10. Because of this artificial split, the district court mischaracterized Providers' claims as merely challenging an "allegedly inadequate administration of" the Programs, as opposed to challenging the arbitrary and capricious nature of the decision to terminate the Programs in the first place—the decision from which Providers' harms can be directly traced. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982); *Doe 1 v. Apple Inc.*, 96 F.4th 403, 409–12 (D.C. Cir. 2024).

Accordingly, the district court erroneously held Providers lacked standing to challenge the "administration" of the federalized (and, in truth, terminated) Programs.  APP1207–10.

Providers' APA claims are not grounded in disagreement with *how* the Programs are being administered, but instead *whether* they are being administered at all.  Put otherwise, Providers' claims aren't about the relative merits of "online 'self-help materials' to deliver services," "as opposed to in-person programming."  APP1207.  Instead, Providers challenge the arbitrary and capricious decision to put a hard stop to the Programs as they had been run for decades.  *See, e.g.*, APP1145–49.

Determining whether that termination decision was arbitrary and capricious turns in part on what (if anything) the Government does to replace the Programs it terminated.  That is because "courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review."  *Chenery*, 318 U.S. at 94.  Here, the Government's termination decision did not include any plan for replacing Programs.  That purported plan emerged only in response to litigation, long after termination.  *See* APP0652.  That delay, the stop in program-

ming, and the ongoing confusion regarding what is replacing the Programs caused Providers' ongoing harms. *See United States v. Texas*, 2025 WL 1836640, at *4 (5th Cir. July 3, 2025) (organization likely to demonstrate injury where it would be required to expend resources for "a period of time before" a final ruling on its legal challenge).

The district court came to the opposite conclusion only after arbitrarily dividing and recharacterizing Providers' claims based on contradictory and after-the-fact submissions by the Government. Because those submissions never should have been considered in the first place, and because the district court used them to miscast Providers' claims, this Court should reverse.

## II.    Providers have standing to challenge the decision to replace the decades-old contractor system with a hollow "federalized model."

Even if the district court's recasting of the agency action were permissible, it also erred in holding that Providers lacked standing to challenge the adequacy of any in-sourced program. Organizational plaintiffs have standing to sue when they have suffered an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical*

*Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015).

The Government's refusal to provide the Orientation and Custodians Programs—whether that be through a hollow "federalization" plan or through the flat-out termination the Government said it undertook for most of this case—harms Providers in at least two ways.

## A.     Providers suffered injury through harm to their organizational missions.

Where an action has "perceptibly impaired" an organization's ability to provide the services they were formed to provide, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp.*, 455 U.S. at 379; *accord, e.g.*, *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020).

This theory of standing has its roots in *Havens Realty*, where the Supreme Court held that a fair housing organization had standing to challenge defendants' discriminatory housing practices because the practices frustrated the organization's ability to provide counseling and forced the organization to devote significant resources to counteract discriminatory practices. *See Havens Realty*, 455 U.S. at 379. As the Court explained, such a "concrete and demonstrable injury to the organization's

41

activities—with the consequent drain on the organization's resources"—
is a clear injury in fact, and "far more than simply a setback to the organ-
ization's abstract social interests." *Id*.

Although courts have been careful not to extend *Havens Realty* to
situations where organizations cannot show an unavoidable drain on
their resources, *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S.
367, 395–96 (2024), organizations can still demonstrate standing when
"the agency's action or omission to act injured the [organization's interest]
and . . . the organization [has] used its resources to counteract that harm,"
*PETA*, 797 F.3d at 1094 (cleaned up).  This Court and other Circuit courts
have continued to apply this rule after *Alliance for Hippocratic Medicine*.
*See, e.g.*, *Ctr. for Biological Diversity v. United States Dep't of the Interior*,
2025 WL 1933680, at *12 (D.C. Cir. July 15, 2025); *Texas*, 2025 WL
1836640, at *9 (confirming *Havens* remains good law).

Moreover, this Court and others have "applied *Havens Realty* to jus-
tify organizational standing in a wide range of circumstances."  *Abigail
Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469
F.3d 129, 133 (D.C. Cir. 2006) (collecting cases); *see also Ctr. for Biologi-
cal Diversity*, 2025 WL 1933680, at *12 (describing *Havens Realty* as the

42

"foundation of our organizational injury precedents"); *Texas*, 2025 WL 1836640, at *3, *8–9 (immigrants' rights organization likely to establish standing under *Havens Realty* to challenge a state immigration law that would impair the organizations' ability to provide counseling and referral services); *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395–97 (4th Cir. 2024) (organizational standing under *Havens Realty* based on plaintiffs' "core organization missions of election security and providing services aimed at promoting Republican voter engagement"). And as district courts in this Circuit have recognized, this Court's application of *Havens* already incorporated the limitations clarified in *Alliance for Hippocratic Medicine*. *See League of United Latin Am. Citizens v. Exec. Off. of Pres.*, 2025 WL 1187730, at *23 (D.D.C. Apr. 24, 2025).

Here, Providers satisfy both elements of the test this Court set forth in *PETA* for assessing organizational standing.

*First*, the Government's actions harmed Providers' organizational interests. Providers are driven by their missions to educate noncitizens regarding their legal alternatives, rights, and obligations in immigration proceedings, assisting them to make more informed decisions as they face

a judge and a Department of Homeland Security prosecuting attorney.
*See, e.g.*, APP0390–91, 394.  Providers further these missions through
their "core business activities," including various programs to provide le-
gal information to noncitizens, referrals to clients for longer term repre-
sentations, and referrals to pro bono legal services.  *See, e.g.*, APP0566,
APP1165.  The Orientation and Custodians Programs are key to Provid-
ers' ability to provide these other services because they ensure that indi-
viduals in removal proceedings are educated about their rights, including
the fact that organizations like Providers exist and can help refer them
to additional resources.  *See, e.g.*, APP0381–83; APP0394; APP0502;
APP0518–19; APP0562–63; APP0568–69.  This remains true even if
someone other than Providers is responsible for running them, so long as
accurate and comprehensive information is provided through those pro-
grams. *See Am. Gateways v. U.S. Dep't of Just.*, 2025 WL 2029764, at *5
(D.D.C. July 21, 2025).

The Government has impeded Providers' abilities to conduct these
core business activities by denying Providers access to the "information
and avenues" they wish to use to conduct these activities.  *See Action All.*

44

*of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986).  For instance, Providers have:

- been denied access to immigration detention centers and immigration courthouses, key avenues for their work providing information to noncitizens regarding immigration proceedings.  *See, e.g.*, APP0383; APP0394; APP0506; APP0539; APP0551.

- lost access to the lists of noncitizens in detention facilities and to docket information for immigration courts, which are critical to allow Providers to provide services, including contact with outside support systems or pro bono counsel.  *See* APP0394; APP0495–96; APP0518–20;   APP0533–34;   APP0539;   APP0551;   APP0557; APP0563–64.

- lost access to informational resources critical to their missions or otherwise seen delays in receiving information key to supporting those in removal proceedings.  *See* APP0571–72, 1168–69; APP1164; APP1157–60.

These impediments adversely affect Providers' ability to provide the services they were formed to provide.  *See, e.g.*, APP0503–04 (one provider has been unable to conduct any legal orientations since April).

45

*Second*, the Government's termination of the Orientation and Custodians Programs has forced Providers to use significant resources to counteract the resulting harm. *See, e.g.*, APP0534. Providers have expended significant time and resources to maintain access to the detention centers and immigration courthouses essential to their work. *See, e.g.*, APP1169. Where access has been denied, Providers have been unable to provide information to individuals in those fora and are forced to conduct their missions in a "less efficient and effective" way, increasing the cost of providing services and dramatically reducing the number of noncitizens Providers can serve. *PETA*, 797 F.3d at 1091; *see also Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994) (organizational standing where defendants' actions interfered with plaintiff organization's programming and required plaintiff organization to expend resources to counteract the effects of defendants' actions).

This is exactly the kind of "unusual case" where a defendants' actions have caused the substantial, tangible costs necessary to show organizational standing. *C.f. Alliance for Hippocratic Med.*, 602 U.S. at 370; *see, e.g.*, *Texas*, 2025 WL 1836640, at *3. None of this is remedied by the

46

purported "federalized" program the Government belatedly raised at summary judgment. Providers' experiences show that, if it does anything, a so-called "federalized program" would actually *limit* the information provided to individuals in detention rather than *provide* fulsome information, as Congress instructed. For example, Amica reported that "self-deportation" posters have replaced the thorough orientation programs previously offered by Providers. APP0406, 0408–09. And American Gateways learned that the South Texas Detention Center library no longer allows reference materials in languages other than English, resulting in many individuals not understanding any reference materials provided. APP0400. American Gateways further noted it was aware of no alternative programming to replace the Orientation Program in Texas. *Id.*

The above evidence shows the district court erred in summarily concluding that the impact of the Government's actions on Providers was not a particularized injury. The district court mischaracterized Providers' bona fide arguments for standing as an attempt to "manufacture" standing by "spend[ing] considerable resources to counteract government ac-

tion that they merely disagree with." APP1210 (citing *Alliance for Hippocratic Med.*, 602 U.S. at 394). But the harms detailed above are far from "manufacture[d]" concerns or the types of expenses incurred to advocate against a policy to which Providers merely have moral, policy, or ideological objections. Instead, they include the expenses necessary to continue to provide actual services for real individuals that Providers offered for years until the Government's actions impeded them. *See, e.g.*, APP0390; APP0511.

Nor is this case like *Alliance for Hippocratic Medicine*. There, plaintiff organizations argued that they had suffered particularized harm because they had "incur[ed] costs to oppose FDA's actions," such as conducting studies on abortion-inducing drugs and "engaging in public advocacy and public education" to object to the FDA's approval of the drugs. 602 U.S. at 394. But plaintiff organizations in *Alliance for Hippocratic Medicine* alleged no direct harm because of the agency action, pointing only to advocacy and education costs to combat the policies to which they objected and attenuated causation theories based on conscience injuries to doctors required to provide abortion-related treatments. The Supreme

Court thus rejected their standing argument, explaining that organizations do not suffer an injury "simply because they object to [an agency's] actions" on ideological grounds, and cautioning that organizations cannot "spend [their] way into standing simply by expending money to gather information [about] and advocate against" those actions. *Id.* at 394.

In contrast, Providers have demonstrated clear, concrete consequences to themselves that result from the Government's decision to stop work, terminate, and then purportedly federalize the Orientation and Custodians Programs that Providers ran for decades. None of Providers' asserted injuries arise from any need to challenge the Government's actions on discretionary policy grounds, nor are the impeded activities ones undertaken to challenge the Government. Instead, the Government's actions impede Providers' longstanding work to provide counseling and referral services to noncitizens regarding immigration proceedings—and further impaired their ability to offer other services that relied in part on the Programs to do outreach and provide referrals. *See e.g.*, APP1153–54. Providers have not pointed to the "expenses of the advocacy" against the Government's actions, but instead to the impact on their ability to provide the services they were formed to provide. *See Texas*, 2025 WL

49

1836640, at *7–12 (organization likely to demonstrate standing because it "identified and described" impacts of a challenged law on its provision of immigration counsel and referral services); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765–66 (9th Cir. 2018) (organization demonstrated standing by showing "enforcement of [an agency] Rule has frustrated their mission"). These practical impacts concern actual work and services to persons in removal proceedings, not mere "legal, moral, ideological, and policy objections" to government action, as was at issue in *Alliance for Hippocratic Medicine.* 602 U.S. at 396.

Providers have demonstrated clear, adverse limitations on the services they have historically provided and are uniquely positioned to provide. *See, e.g.*, APP0390; APP0511. The district court's contrary conclusion erodes the principles established in *Havens Realty*, which remains good law and an important bedrock for judicial review. *See Ctr. for Biological Diversity*, 2025 WL 1933680, at *12; *Texas*, 2025 WL 1836640, at *9. This Court should reverse and hold that Providers have organizational standing to challenge the Government's termination of the Orientation and Custodians Programs.

### B.    The funding cutoff injured Providers.

"To demonstrate injury in fact, an organization must allege a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Am. Anti-Vivisection*, 946 F.3d at 618 (cleaned up).  In this Court, that means showing the agency's action injured the organization's interest and the organization used its resources to counteract that harm.  *PETA*, 797 F.3d at 1094.

The district court's analysis of Providers' financial injury was half-right, correctly holding that Providers' financial injuries confer standing, but it improperly limited this standing to challenging only a "procurement" decision.  APP1191–93.  This Court should reaffirm the first part of that analysis and reject the second.

The Orientation and Custodian Programs providers across the nation receive approximately $9 million dollars annually—which represents substantial portions of Providers' overall operating budgets and funds many full-time staff dedicated to the Programs.  *See, e.g.*, APP0399 (27% of American Gateways' budget and over 32% of staff); APP0409 (20% of Amica's Detained Adult Program budget); APP0500 (13 staff at

Estrella are exclusively funded through the programs); APP0513 (18 Florence Project staff are dedicated primarily to the Orientation Program). As nonprofit organizations, Providers cannot continue the critical work at the core of their missions—to ensure individuals in removal proceedings are educated about their rights and responsibilities—without the appropriated, allocated funding.

The Government's April termination cut off Providers' access to these funds. *See, e.g.*, APP0407–08. Financial injuries like these are the "gold standard or 'prototypical form of injury in fact.'" *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121 at 133 (D.D.C. 2025) (citing *Collins v. Yellen*, 594 U.S. 220, 243 (2021)). These injuries force Providers to reassign, furlough, or terminate staff, shift funding between programs, and expend resources reorganizing their operations and seeking other sources of funding. *See* APP0387; APP0393–94; APP0399; APP0503–04; APP0558; APP1165. This has left a large gap in services Providers are able to provide to noncitizens. *See, e.g.*, APP0383; APP0394; APP0502; APP0518–19 APP0562; APP0568.

These financial harms are at least partially redressable so long as the Programs continue—even if someone else runs them. The Programs

impact Providers' other critical mission-based services, including con-
necting noncitizens to pro bono legal services.    *See, e.g.*, APP0383;
APP0394; APP0502; APP0518–20; APP0562; APP0568–69.   If the Pro-
grams are running, Providers can work with the new providers to assist
with these referrals and other core services to ensure their core opera-
tional activities continue unimpeded.   But, as it stands now, Providers
must either continue to provide the Programs absent funding to support
their missions, or they must abandon these services to conserve re-
sources.   As a result, the financial burden on Providers is severe—they
must strive to do more with less, or risk abandoning their missions en-
tirely.   These harms are sufficient to create standing.   *See AIDS Vaccine*,
770 F. Supp. 3d at 133–34.

## III.  The Tucker Act did not divest the district court of jurisdiction over Providers' claims.

Providers' claims challenge the Government's unlawful decision to
terminate the congressionally mandated Programs.   The Tucker Act does
not require these non-contractual, non-procurement claims to be brought
in the Court of Federal Claims.

There is a "strong presumption that Congress intends judicial re-
view of administrative action."   *Bowen v. Mich. Acad. of Fam. Physicians*,

476 U.S. 667, 670 (1986). As a targeted exception, the Tucker Act removes district court jurisdiction over two narrow categories of claims, which must be brought in the Court of Federal Claims: (1) bid protests challenging federal procurement decisions, 28 U.S.C. § 1491(b); and (2) claims arising from a government contract and seeking contractual relief against the government, 28 U.S.C. § 1491(a).

The Court of Federal Claims generally cannot issue an injunction, and thus cannot provide prototypical APA relief—striking down unlawful agency action—because it "lacks the general federal question jurisdiction of the district courts, which would allow it to review [an] agency's actions and to grant relief pursuant to the" APA. *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997). So, the question of the Tucker Act's application here strikes at the heart of the judiciary's constitutional and statutory duty to act as a check on Executive agency overreach: If Providers cannot challenge the Government's termination decision—a decision the Government admitted was indefensible under the APA, APP0851—in the district court, the Government's decision to ignore congressional commands is effectively unreviewable.

54

Neither prong of the Tucker Act divests the district court of jurisdiction over Providers' claims, and the district court's *sua sponte* ruling applying § 1491(b) was legally erroneous.  Because Providers are challenging the termination of the Programs—not any specific procurement decision—the Tucker Act does not bar review.

### A.    Section 1491(b) does not apply because Providers do not challenge a procurement decision.

Section 1491(b) of the Tucker Act expresses Congress's intent "to vest a single judicial tribunal [the Court of Federal Claims] with exclusive jurisdiction to review government contract protest actions." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001).  The Court of Federal Claims has exclusive jurisdiction over bid protests (1) brought by an "interested party" and (2) challenging "any alleged violation of statute or regulation in connection with a *procurement*" decision.  28 U.S.C. § 1491(b)(1) (emphasis added).  The district court's application of this section to claims challenging the termination of congressionally mandated programs is novel, unsupported by any briefing or argument from the parties (despite numerous briefing opportunities and hearings), and unsupported by analogous precedent.  Section 1491(b)

55

does not apply because Providers do not challenge a procurement decision or invoke a procurement regulation.

Below, Providers consistently described their claims as challenging the Government's decision to end the Programs. See APP0336, 675, 1035, 1039–41, 1130–31. In its order, the district court misstated Providers' claims as challenging the government's decision to "in-source" the Programs, not the overarching decision to terminate the Programs. AP1191. Based on this mischaracterization, the court concluded Providers' claims challenge "a procurement decision" under § 1491(b). APP1193–96. But Providers' claims are fundamentally distinct from those that fall within § 1491(b)'s jurisdictional scope.

No court has applied § 1491(b) to claims that, like Providers', challenge the termination of congressionally mandated programs—and are agnostic to *how* the Government effectuates this termination, whether by cancelling contracts or phantom "in-sourcing." The paradigmatic § 1491(b) case involves a "[l]osing bidder" who is denied a government contract and files a "bid protest," alleging harm because "there is a substantial chance it would have received the contract award but for [an] alleged error in the procurement process." *Tinton Falls Lodging Realty,*

*LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (lost bid for contract to provide hotels and transportation for civil service mariners). In these cases, the most commonly sought relief is an order resulting in a reopened bidding process. *See, e.g.*, *id.* at 1359.

Providers' case is nothing like that. Providers do not allege any "error in the procurement process" or seek to reopen a bidding process. *Id.* at 1358. Instead, Providers seek an order setting aside the Government's unlawful termination of the Programs, which need not result in any contract or bidding process. The Government may *choose* to contract to follow Congress's command, but the crux of this case is that it *follows* Congress's command, not *how* it chooses to do so.

The few cases that address decisions to in-source federal programs do not control, as they stand only for the uncontroversial proposition that the Tucker Act covers claims alleging violations of procurement regulations. In those cases, a disappointed bidder challenged the Government's decision to perform a service itself, instead of contracting for the service, by alleging this decision violates procurement regulations. For example, in *Fisher-Cal Industries, Inc. v. United States*, the Air Force chose not to renew a contract for "multimedia services" with Fisher-Cal, and instead

57

to have Air Force employees perform this work.  747 F.3d 899, 900 (D.C. Cir. 2014) (cited at APP1195).  Fisher-Cal sued the Air Force in district court, claiming its decision to in-source was unlawful because it did not perform a cost analysis required by regulations governing military procurement decisions.  *Id*.  The district court concluded it did not have jurisdiction over this claim, which it held was a procurement challenge under § 1491(b), because the decision to in-source was "in connection with a procurement" within the Tucker Act.  *Fisher-Cal Indus., Inc. v. United States*, 839 F. Supp. 2d 218, 224 (D.D.C. 2012).  This Court affirmed, reasoning that the claims challenged an agency decision about the government's "need to procure."  *Fisher-Cal*, 747 F.3d at 902-03.

The district court mischaracterized *Fisher-Cal*'s allegations of procurement regulation violations as "on all fours" with this case.  APP1195.  Providers' claims in no way relate to any procurement regulation.  Although the cases do not explicitly limit § 1491(b) to claims alleging procurement violations, to Providers' knowledge, every in-sourcing case under § 1491(b) is inextricably connected to claims alleging violations of *procurement* laws and regulations, identifying the procurement decision itself as the challenged agency action.

58

The only other in-sourcing case the district court cited, *Rothe Development, Inc. v. United States Department of Defense*, also involved claims alleging violations of "procurement procedures." 666 F.3d 336, 338 (5th Cir. 2011) (cited at APP1195). Other in-sourcing cases confirm that § 1491(b) applies to claims alleging violations of laws and regulations that set procurement procedures. *See Vero Tech. Support, Inc. v. U.S. Dep't of Def.*, 437 Fed. App'x 766, 770 (11th Cir. 2011) (alleging violation of the same procurement regulation at issue in *Fisher-Cal*); *Santa Barbara Applied Rsch., Inc. v. United States*, 98 Fed. Cl. 536, 537 (2011) (same); *Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 154 (D.D.C. 2004) (alleging violation of "federal procurement law").

Providers are also aware of no case applying § 1491(b) to claims challenging an "in-sourcing" decision as the means of terminating a congressionally mandated program—regardless of the in-sourcing's compliance with procurement regulations. And of the hundreds of cases challenging the Executive's many decisions in the last six months to terminate funded programs, not one other court has applied § 1491(b) to deprive a district court of jurisdiction. Indeed, the Government never

59

raised § 1491(b) as a potential bar to this action, despite relying exten-

sively on § 1491(a).  Instead, the district court's insistence on mischarac-

terizing Providers' claims and refusal to acknowledge the fundamental

differences between this case and in-sourcing cases that involve procure-

ment issues creates a new and dangerous line of law.  Affirming the dis-

trict court's interpretation will create a loophole for any federal agency

that wants to cancel a program where cancellation would violate the APA

and congressional commands.  By saying the agency is in-sourcing the

program, even if the program does not in fact continue, the agency could

avoid district court review and avoid any possibility of an injunction to

undo the agency's unlawful termination.  This outcome cannot be squared

with Congress's broad grant of APA jurisdiction, and this Court should

reject this novel application of § 1491(b) to Providers' claims.

### B.  Section 1491(a) does not apply because Providers' claims do not arise from contract or seek contractual relief.

The district court correctly held that § 1491(a) of the Tucker Act

does not apply to Providers' claims that "challeng[e] the lawfulness of [the

Government's] wholesale termination of these programs under the APA."

APP1197.  Because *all* of Providers' claims challenge termination of the

Programs, as explained above, the district court's logic in holding § 1491(a) inapplicable extends to all of Providers' claims.

The operative question to determine whether § 1491(a) applies is whether the "action against the United States . . . is *at its essence* a contract claim." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). Here, Providers challenge the lawfulness of the Government's decision to terminate the Programs without providing an adequate equivalent, causing a gap in services, not whether the Government breached any contract or violated any contractual right, or whether the Government terminated any contract in violation of contract terms. Providers' claims satisfy neither prong of the test set forth in *Megapulse v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) (where a plaintiff "does not claim a breach of contract," and seeks neither monetary damages nor specific performance, there is no contract claim). *See Am. Gateways*, 2025 WL 2029764, at *6–7.

Providers' claims do not invoke contract rights or seek a contractual remedy. Section 1491(a) deprives district courts of jurisdiction over claims that are "founded only on a contract" with the government, but not of jurisdiction over claims that "despite the presence of a contract . . .

61

stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992).  Providers' claims do not arise from contract because, as the district court recognized, the court "need not examine any 'agreement negotiated by the parties,' but it must 'interpret[]' the APA and the relevant appropriations." APP1197.  Further, § 1491(a) applies only to claims that seek "money in compensation for losses," or other contractual relief like specific performance—not to claims seeking "declaratory and injunctive relief." *Bowen*, 487 U.S. at 893, 895.  Instead, courts must "respect [Providers'] choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent the jurisdiction of the Court of Federal Claims" so long as Providers' "complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

Accordingly, § 1491(a) of the Tucker Act does not divest the district court of jurisdiction in this case.  APP1197.

62

## IV. The termination of the Helpdesk Program is not a discretionary decision beyond judicial review.

The district court held Providers had standing to challenge the wholesale termination of the Helpdesk Program and that the Tucker Act did not bar jurisdiction. APP1196–97. But the district court nonetheless declined to reach the merits, holding that implementation of the Helpdesk Program as part of the "Legal Orientation Program" was subject to unreviewable agency discretion. APP1198–1200. Not so.

Whether the Helpdesk Program is encompassed as part of the "services and activities of the Legal Orientation Program" is a question of statutory interpretation. As the Supreme Court recently reaffirmed, questions of statutory interpretation are for courts to resolve, and are not matters delegated to agency discretion. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). The district court's failure to consider whether the "services and activities of the Legal Orientation Program" include the Helpdesk Program (and instead relying on agency discretion to resolve a statutory ambiguity) was legal error. This Court should reverse.

To interpret statutes, courts begin with the plain language of the text, interpreting it "according to its ordinary, contemporary, common

meaning" and understanding that words "must be read and interpreted in their context, not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (cleaned up). Here, the relevant statutory language is the "services and activities provided by the Legal Orientation Program." 138 Stat. at 133. Congress chose not to define the term "Legal Orientation Program" or explicate what "services and activities" are part of that program in the statute. Nonetheless, the relevant context makes clear that the Helpdesk Program was encompassed within this appropriation and EOIR does not retain discretion as to *whether* to fund it.

In 2016, EOIR launched the Helpdesk Program at the specific direction of Congress. *See* APP0020 (noting that Congress provided "specific funding" for it). Although Congress has provided funding for the Programs since 2003, the language in the current appropriations bill first appeared in 2019, earmarking $11,400,000 "for services and activities provided by the Legal Orientation Program." *See* Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13, 102 (2019).

By 2019, EOIR had established the Orientation Program (in 2003), the Custodians Program (in 2010), and the Helpdesk Program (in 2016).

EOIR treated the Helpdesk Program as an orientation program: the Acacia contract distinguished between "Legal Orientation Programs" and "Legal Representation Programs," APP0022, treating the Helpdesk Program as a legal orientation program, APP0123–24. Further, EOIR described the Helpdesk Program as helping "to orient non-detained noncitizens," and not as a representation program. AP0026. The Government has already recognized that "the services and activities provided by the Legal Orientation Program" extend beyond just the Orientation Program, as it recognizes that the Custodians Program is covered by that language. That language also extends to the Helpdesk Program.

Legislative history confirms this. *See Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1349 (D.C. Cir. 1996) (recognizing legislative history provides "strong evidence" for interpreting an ambiguous appropriation); *see also J.G.G. v. Trump*, 2025 WL 914682, n.7 (D.C. Cir. Mar. 26, 2025) ("Although 'legislative history is not the law,' it can provide some probative evidence of the original public meaning of the text.").

The legislative history for appropriations statutes is particularly helpful because Congress takes steps to bind agencies to statements con-

tained therein.  Each year, Congress includes a joint explanatory statement, which it incorporates into the appropriations bill by requiring agencies to notify Congress before eliminating funds for any programs identified in the appropriations statute or the joint explanatory statement.  *See, e.g.*, 138 Stat. at 26, 154, 167 (incorporating the explanatory statement and requiring notice to the House and Senate Appropriations Committees before "deviat[ing] from the amounts designated for specific activities in [the appropriations bill] and in the explanatory statement above"); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1185, 1264, 1276.  In turn, the joint explanatory statement incorporates the latest Senate or House Report and requires agencies to notify Congress of any deviation from the funding requirements contained therein.  *See, e.g.*, 170 Cong. Rec. S1398 (Mar. 5, 2024) ("Unless otherwise noted, the language set forth in Senate Report 118-62 ('the Senate Report') carries the same weight as language included in this joint explanatory statement and should be complied with."); 166 Cong. Rec. H7879 (Dec. 21, 2020).  As a result, the Senate and House Reports accompanying appropriations bills are uniquely authoritative sources for

clarifying any ambiguities that may exist in the statutory appropriations language.

Here, the reports make clear that the Helpdesk Program is part of the "services and activities provided by the Legal Orientation Program." For example, in 2018, the Senate Report for the FY 2018 appropriations recommended funding "for services provided by LOP," which "include[d] funding for both the Immigration Held Desk and LOP for Custodians." S. Rep. 115–275, 70–71 (2018); *see also* S. Rep. 116-127, 86 (2019). For FY 2019, the House Report directed DOJ "to continue LOP without interruption, including all component parts, including … the [Immigration Court Helpdesk] ICH." H. Rep. 116-101, 47 (2019). In line with this, for FY 2024, the Senate Report again provided funds "for services provided by LOP, including $5,000,000 for the operation of the Immigration Help Desk [ICH]." S. Rep. 118-62, at 85.

Thus, the "services and activities provided by the Legal Orientation Program" encompasses the Helpdesk Program. DOJ and EOIR retain no discretion to unilaterally terminate this program, any more than they have discretion to terminate the Orientation Program or the Custodians Program. Indeed, the Government appears to recognize that the earmark

67

requires funding beyond just the Orientation Program, as it continues to provide the Custodians Program.  The Custodians Program, like the Helpdesk Program, existed alongside the Orientation Program when Congress first included this language in appropriations laws and is treated the same in the relevant congressional records and reports.

For this reason, *International Union, United Automotive, Aerospace & Agricultural Implement Workers of America v. Donovan*, 746 F.2d 855 (D.C. Cir. 1984), is inapposite.  Providers do not dispute that "'the text of the appropriation' is controlling."  APP1200.  But Providers maintain that the text of the appropriation encompasses the Helpdesk Program.  And *Donovan* does not contemplate that the legislative history is wholly irrelevant when interpreting statutes.  Instead, in *Donovan*, the Court expressly recognized that the legislative history was relevant because it illustrated no intent to require the agency to act in a particular way and instead supported the Court's holding that the allocation of funds was left to agency discretion.  746 F.2d at 860–61, 864.  Here, the legislative history similarly supports the plain meaning of the text, but makes clear Congress did not grant EOIR discretion in determining what constitutes the "services and activities of the Legal Orientation Program."

68

The district court erred in failing to recognize that the "services and activities provided by the Legal Orientation Program" encompassed the Helpdesk Program.  This Court should reverse.

## V.    Should proceedings in the district court continue, a preliminary injunction is warranted.

Because the district court erroneously ruled for the Government on the merits, it did not consider the other factors relevant to Providers' motion for a preliminary injunction.  Accordingly, this Court may independently review the factors and grant Providers' request.  *See League of Women Voters*, 838 F.3d at 7.  If the Court does not grant judgment in favor of Providers and further proceedings are necessary, this Court should instruct the district court to grant Providers' preliminary injunction motion, because the four-factor test shows such relief is warranted.

A court should grant a preliminary injunction if plaintiffs establish (1) a likelihood of success on the merits; (2) irreparable harm; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In suits against the government, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

69

Providers are likely to succeed on the merits, as discussed above. Providers are suffering irreparable harm without an injunction, in the form of mission harms (*supra* § II.A) and devastating financial harms (*supra* § II.B). The balance of the equities and public interest favor an injunction because the Government has no valid interest in "act[ing] unlawfully even in pursuit of desirable ends." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). To the contrary, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12. As Congress recognized by appropriating money for the Programs, the Programs further the critical public interest in an efficient and fair immigration system that reaches an appropriate result in individual cases. A preliminary injunction is appropriate to protect Providers and the public interest pending entry of final judgment.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment to the Government and remand with instructions to enter judgment for Providers and order the Government to reinstate the Programs as required by Congress. In the alternative, the Court should remand

70

with instructions to grant Providers' request for a preliminary injunction and to allow Providers to conduct discovery in support of their claims.

Date:  August 4, 2025                    Respectfully submitted,

/s/ *Laura M. Sturges*                   /s/ *Adina Appelbaum*
GIBSON DUNN & CRUTCHER                  AMICA CENTER FOR
LLP                                      IMMIGRANT RIGHTS

Amer S. Ahmed                            Adina Appelbaum
Richard W. Mark                          Samantha Hsieh
200 Park Avenue                          Amelia Dagen
New York, NY 10166-0193                  Amica Center for Immigrant
(212) 351-4000                           Rights
aahmed@gibsondunn.com                    1025 Connecticut Avenue NW,
rmark@gibsondunn.com                     Suite 701
                                         Washington, DC 20036
Laura M. Sturges                         (202) 331-3320
Caelin Moriarity Miltko                  adina@amicacenter.org
1900 Lawrence Street, Suite              sam@amicacenter.org
3000                                     amelia@amicacenter.org
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com                  *Attorneys for Plaintiffs-Appellants*
cmoriaritymiltko@gibson-
dunn.com

71

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7) and D.C. Cir. R. 28(c) because this brief contains 12,928 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this opposition has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font.

*/s/  Laura M. Sturges*
Laura M. Sturges
GIBSON, DUNN & CRUTCHER LLP

*Counsel for Plaintiffs-Appellants*

# ADDENDUM

## ADDENDUM OF PERTINENT STATUTES

Pursuant to Circuit Rule 28(a)(5), this addendum includes the following pertinent statutory provisions and rules, reproduced verbatim:

**Exhibit A:** 5 U.S.C. § 706(2)

**Exhibit B:** 8 U.S.C. § 1232(c)(4)

**Exhibit C**: 28 U.S.C. 1491(a)(1), (b)(1)

**Exhibit D**: 41 U.S.C. § 111

**Exhibit E**: Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, tit. III, 138 Stat. 25,  133 (2024)

# EXHIBIT A

5 U.S.C. § 706

Title 5—Government Organization and Employees

Chapter 7—Judicial Review

## § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

. . .

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**EXHIBIT B**

8 U.S.C. § 1232(c)(4)

Title 8—Aliens and Nationality

Chapter 12—Immigration and Nationality

**§ 1232. Enhancing efforts to combat the trafficking of children**


**(c) Providing safe and secure placements for children**

(4) Legal orientation presentations

The Secretary of Health and Human Services shall cooperate with the Executive Office for Immigration Review to ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by the Executive Office for Immigration Review.  At a minimum, such presentations shall address the custodian's responsibility to attempt to ensure the child's appearance at all immigration proceedings and to protect the child from mistreatment, exploitation, and trafficking.

## EXHIBIT C

### 28 U.S.C. 1491(a)(1), (b)(1)

Title 28—Judiciary and Judicial Procedure

Chapter 91—United States Court of Federal Claims

## § 1491. Claims against United States generally; actions involving Tennessee Valley Authority

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.  For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

. . .

(b)(1) Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.  Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

77

# EXHIBIT D

41 U.S.C. § 111

Title 41—Public Contracts

Chapter 1—Definitions

## § 111. Procurement

In this subtitle, the term "procurement" includes all stages of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.

## EXHIBIT E

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, tit. III, 138 Stat. 25,  133 (2024)

Division C—Commerce, Justice, Science, and Related Agencies Appropriations Act, 2024

Title II—Department of Justice

**Executive Office for Immigration Review**

For expenses necessary for the administration of immigration related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the "Immigration Examinations Fee" account, and of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program: *Provided*, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

79

## CERTIFICATE OF SERVICE

I hereby certify that, on August 4, 2025, I electronically filed the foregoing Plaintiffs-Appellants' Opening Brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Date:  August 4, 2025

Respectfully submitted,

*/s/ Laura M. Sturges*
Laura M. Sturges
GIBSON, DUNN & CRUTCHER LLP

*Counsel for Plaintiffs-Appellants*