# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

AMICA CENTER FOR IMMIGRANT RIGHTS, et al.,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

## BRIEF FOR APPELLEES

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

Plaintiffs-appellants are Amica Center for Immigrant Rights, American Gateways, Estrella Del Paso, Florence Immigrant & Refugee Rights Project, Immigration Services and Legal Advocacy, National Immigrant Justice Center, Northwest Immigrant Rights Project, Pennsylvania Immigration Resource Center, Rocky Mountain Immigrant Advocacy Network, Immigration Center for Women and Children, American Bar Association, and Charlotte Center for Legal Advocacy.

Defendants-appellees are United States Department of Justice; Executive Office for Immigration Review; United States Department of Homeland Security; Sirce E. Owen, in her official capacity as Acting Director of the Executive Office for Immigration Review; Kristi Noem, in her official capacity as Secretary of Homeland Security, Department of Homeland Security; and Pamela J. Bondi, in her official capacity as Attorney General of the United States.

Amici in district court were Harris County, Texas, and a group of "Former Immigration Judges & Former Members of the Board of Immigration Appeals" composed of the following individuals: Steven Abrams; Terry A. Bain; Sarah M. Burr; Jeffrey S. Chase; George T. Chew; Joan V. Churchill; Lisa Dornell; Bruce J. Einhorn; Cecelia M. Espenoza; Noel A. Ferris; James R. Fujimoto; Annie S. Garcy; Gilbert Gembacz; Jennie Giambastiani; Alberto E. Gonzalez; John F. Gossart, Jr.; Paul Grussendorf; Miriam Hayward; Sandy Hom; Charles M. Honeyman; Rebecca Jamil; William P. Joyce; Edward F. Kelly; Carol King; Eliza C. Klein; Christopher M. Kozoll; Elizabeth A. Lamb; Dana Leigh Marks; Margaret McManus; Steven Morley; Robin Paulino; Charles Pazar; George Proctor; Laura L. Ramirez; Lory D. Rosenberg; Susan G. Roy; Paul W. Schmidt; Patricia M. B. Sheppard; Helen Sichel; Denise Slavin; Andrea Hawkins Sloan; A. Ashley Tabaddor; Robert D. Vinikoor; Polly A. Webber; Robert D. Weisel; and Mimi Yam.

No amici have appeared in this Court as of the date of this filing.

## B. Rulings Under Review

The rulings under review are the opinion and order entered in *Amica Center for Immigrant Rights v. U.S. Department of Justice*, No. 1:25-cv-298

(D.D.C.) (Dkt. Nos. 83 and 84), by the Honorable Randolph D. Moss on July 6, 2025. The district court's opinion is not published but is available at 2025 WL 1852762.

C.    **Related Cases**

This case was not previously before this Court. Related issues are pending before this Court in *Vera Institute of Justice v. U.S. Department of Justice*, No. 25-5248 (D.C. Cir.), in which this Court has set an expedited briefing schedule similar to the schedule entered in this case and scheduled oral argument for October 21, 2025.

/s/ *Sean R. Janda*
Sean R. Janda

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUES ........................................................... 4

PERTINENT STATUTES AND REGULATIONS ........................................ 4

STATEMENT OF THE CASE ............................................................ 4

    A.    Legal and Factual Background .......................................... 4

    B.    Procedural Background ................................................. 10

SUMMARY OF ARGUMENT ............................................................ 16

STANDARD OF REVIEW ................................................................ 23

ARGUMENT ..................................................................................... 23

I.    The District Court Lacked Jurisdiction over Plaintiffs' Claims Challenging EOIR's Termination of Task Orders Under the Acacia Contract ............................................................................. 23

    A.    Plaintiffs' Claims Challenging the Termination of Task Orders Are Barred as Improper Challenges to Procurement Decisions .................................................... 23

    B.    Plaintiffs' Challenges Are Also Barred by the Tucker Act .......... 28

II.    Plaintiffs' Attempt to Challenge the Manner in Which the Government Is Providing Legal Orientation Services Is Unavailing ................................................................................... 37

A.     Plaintiffs Lack Standing to Challenge the Manner in Which EOIR Is Providing the Relevant Services ......................................37

B.     The Challenged Decisions Are Committed to Agency Discretion by Law .............................................................................45

III.   Plaintiffs' Remaining Arguments Fail .......................................54

CONCLUSION...........................................................................................61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                           **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the*
  *Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ............................................................... 29

*American Pub. Health Ass'n v. National Insts. of Health*,
  145 F.4th 39 (1st Cir. 2025) ................................................................ 33

*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) ................................................................ 30

*Camp v. Pitts*,
  411 U.S. 138 (1973) (per curiam) ...................................................... 56

*Center for Biological Diversity v. U.S. Dep't of the Interior*,
  144 F.4th 296 (2025) ............................................................. 41-42, 42

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ........................................................... 28

*Department of Com. v. New York*,
  588 U.S. 752 (2019) ........................................................................... 58

*Department of Educ. v. California*,
  145 S. Ct. 966 (2025) ............................................................. 19, 30, 31

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ........................................ 3, 16, 20, 38, 39, 41, 42

*FDA v. R. J. Reynolds Vapor Co.*,
  145 S. Ct. 1984 (2025) ....................................................................... 28

*Fisher-Cal Indus., Inc. v. United States*,
  747 F.3d 899 (D.C. Cir. 2014) ................................................. 13, 24, 25

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .......................................................................21, 47

*Hispanic Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ............................................................ 23

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
  238 F.3d 1324 (Fed. Cir. 2001) ........................................ 27

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ............................................35

*International Union, United Auto., Aerospace & Agric.
  Implement Workers of Am. v. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) ..................................... 49, 52

*Kidwell v. Department of the Army, Board for Correction
  of Military Records*,
  56 F.3d 279 (D.C. Cir. 1995) ..................................... 36, 37

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ......................................... 21, 46, 47

*Lujan v. National Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................... 59

*Make the Road N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .................................... 56

*Match-E-Be-Nash-She-Wish Band of
  Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ........................................ 28-29, 29

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) .................................. 29, 34

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ................................... 47, 48

*National Insts. of Health v. American Pub.
  Health Ass'n*,
  No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .............. 19, 30-31, 31

*People for the Ethical Treatment of Animals
  v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ................................. 41, 42

*Percipient.ai, Inc. v. United States*,
  No. 23-1970 (Fed. Cir. Aug. 28, 2025) (en banc) ...............28

*Rhea Lana, Inc. v. United States*,
   925 F.3d 521 (D.C. Cir. 2019) ...........................................57

*Rtskhiladze v. Mueller*,
   110 F.4th 273 (D.C. Cir. 2024) ....................................... 60

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ........................................................ 56

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ................................... 34, 35

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), *vacated in part*,
   2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ........................... 33, 35

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................ 60

**Statutes:**

Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 133 .....................5, 48, 50, 51

5 U.S.C. § 702 ........................................................ 37

8 U.S.C. § 1232(c)(4) ................................................. 5, 11

25 U.S.C. § 13 ........................................................53, 54

28 U.S.C. § 1291 ........................................................ 3

28 U.S.C. § 1331 ........................................................ 3

28 U.S.C. § 1491(a)(1) ................................................. 29

28 U.S.C. § 1491(b) ............................................... 17, 18, 23

28 U.S.C. § 1491(b)(1) ............................................... 13, 26

28 U.S.C. § 1491(b)(4) ................................................. 27

41 U.S.C. § 111 ................................................................................25

**Regulations:**

8 C.F.R. § 1003.0 ............................................................... 4

8 C.F.R. § 1003.0€(1) .......................................................... 4

FAR 52.249-2 ..................................................................... 7

FAR 52.249-6 ..................................................................... 7

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ..................................................2

**Legislative Material:**

S. Rep. No. 118-62, at 85 (2023).........................................51

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Department | U.S. Department of Justice |
| EOIR | Executive Office of Immigration Review |

## INTRODUCTION

This case arises out of the Executive Office for Immigration Review's (EOIR's) decision to terminate specific task orders issued under a contract that the agency maintained with the Acacia Center for Justice. Those task orders reflected EOIR's previous decision to contract with Acacia—who subcontracted with plaintiffs—to deliver certain legal orientation services to noncitizens (or custodians of noncitizens) in immigration proceedings. EOIR has now determined that it wishes to provide some of those services itself and that it wishes to cease funding other services. To that end, it terminated the relevant contractual instruments.

Plaintiffs then brought this suit. According to plaintiffs, EOIR acted unlawfully when it terminated the relevant task orders. And plaintiffs contend that EOIR is failing to directly provide adequate orientation services to noncitizens. Judge Moss rejected plaintiffs' claims in their entirety, concluding as relevant here that some must be brought in the Court of Federal Claims, that plaintiffs lack standing to advance others, and that still others challenge agency action committed to agency discretion by law.

The district court was correct that plaintiffs' suit may not proceed, although many of the threshold problems with plaintiffs' suit sweep more

broadly than the district court appreciated. For one, as the district court recognized, plaintiffs' claims challenging EOIR's decision to cease procuring services from an outside contractor are barred because Congress has precluded district court jurisdiction over any challenge to a procurement decision based on an asserted violation of any statute or regulation. EOIR's decision to terminate the procurement task orders here is thus not subject to judicial review—even for compliance with relevant statutes—in district court. Moreover, and independently, plaintiffs' claims challenging EOIR's termination of contractual instruments are essentially contractual claims that must be brought in the Court of Federal Claims, not in district court. The Supreme Court has now twice made clear that such claims may not be brought through the Administrative Procedure Act (APA), most recently rejecting—in a decision rendered after the district court's decision here—the precise argument plaintiffs press here.

As the district court also recognized, plaintiffs' problems stretch even beyond that. Plaintiffs have no cognizable interest in the adequacy of EOIR's continued delivery of legal orientation services to noncitizens. And plaintiffs' attempt to establish standing to challenge EOIR's actions based on their purported organizational missions runs headlong into the Supreme

Court's recent rejection of such theories of standing in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Not only that, but EOIR's decisions to terminate contracts funding certain services, to in-source some services, and to cease funding other services are all committed to agency discretion by law. Plaintiffs have failed to identify any relevant statutory constraints on EOIR's broad discretion to allocate appropriated funding as EOIR determines best to efficiently and effectively deliver legal orientation services.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. *See* App. 1043. For the reasons explained below, *see infra* pp. 23-45, the district court lacked jurisdiction over plaintiffs' claims. The district court entered an order granting summary judgment for defendants in part and dismissing plaintiffs' remaining claims without prejudice for lack of subject matter jurisdiction on July 6, 2025. *See* App. 1211. Plaintiffs filed a timely notice of appeal on July 14, 2025. App. 1213; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1.  Whether plaintiffs' claims challenging EOIR's decision to terminate funding under the Acacia contract are barred by the Tucker Act;

2.  Whether plaintiffs have established Article III standing to challenge the adequacy of EOIR's ongoing delivery of legal orientation services; and

3.  Whether EOIR's determinations regarding which legal orientation services to fund are committed to agency discretion by law.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Legal and Factual Background

1.  The Executive Office for Immigration Review is a subcomponent of the Department of Justice that generally comprises the various components of the immigration enforcement system, including immigration courts and the Board of Immigration Appeals. *See* 8 C.F.R. § 1003.0.  Among other functions, EOIR provides various "legal orientation program activities" related to immigration proceedings. *See id.* § 1003.0(e)(1).

In the main, EOIR's legal orientation activities are not directed or constrained by statutory mandates.  Instead, those activities have grown

organically over previous decades, starting with a limited pilot project in 1989 and ultimately expanding to include a number of different services aimed at different populations.  *See generally* App. 1172-74.  In one instance, however, Congress has mandated specific legal orientations, providing that EOIR and the Secretary of Health and Human Services shall "ensure that custodians" of unaccompanied children "receive legal orientation presentations" and that such presentations must "address the custodian's responsibility to attempt to ensure the child's appearance at all immigration proceedings and to protect the child from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(4).  In the most recent relevant appropriations statute, Congress funded EOIR's activities with a lump-sum appropriation of $844,000,000 for "expenses necessary for the administration of immigration-related activities of" EOIR, "of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program."  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 133; *see also* App. 1173 (explaining that Congress has continued funding at this amount through September 30, 2025).

2. In recent years, EOIR has contracted with Acacia Center for Justice, a nonprofit organization, to procure various services related to "provid[ing] legal access, orientation, and representation services to noncitizens who are, or may be placed, in immigration proceedings." App. 25. Of particular relevance to this case, three of the "services to be performed" under the contract included implementing and managing a Legal Orientation Program for Detained Adults (Legal Orientation Program), a Legal Orientation Program for Custodians of Unaccompanied Children (Custodians Program), and an Immigration Court Helpdesk Program (Helpdesk Program). App. 25-26.

In brief, the Legal Orientation Program described in the contract involved providing various services, such as "group orientations; individual orientations; [and] self-help workshops," for "detained adult noncitizens who are, or may be placed, in immigration proceedings." App. 25. The Custodians Program involved providing similar "legal orientation presentations" for custodians of unaccompanied minors. *Id.* And the Helpdesk Program involved providing similar services at "immigration court locations" for the benefit of "non-detained noncitizens." App. 26.

That contract contemplates that EOIR will initiate the provision of specific services "through issuance of individual task orders." App. 25. The most recent set of task orders "spann[ed] approximately one year and expir[ed] in July or August 2025, depending on the program." App. 1174. Consistent with the contract's nature as one for the procurement of services, the contract also "incorporated numerous provisions from the Federal Acquisition Regulations," which codifies uniform policies "used by executive agencies when acquiring" services. App. 1174 & n.3. Most relevant here, the contract incorporated termination clauses, which authorized the government to terminate performance of work under the contract, in whole or in part, if the government "determine[d] that a termination is in the Government's interest." FAR 52.249-2; FAR 52.249-6; *see* App. 60. The contract also contemplated that at its conclusion, "the functions performed under the contract" "may convert to an in-house Government operation or may be awarded through another contractual instrument." App. 27.

3. On April 10, the Department of Justice exercised its authority under the contract's termination clauses to terminate for the convenience of the government the operative task orders for the Legal Orientation Program, the Custodians Programs, and the Helpdesk Program, among others. App.

234.[1]  The Acting Director of EOIR has explained that EOIR had "previously considered transitioning away from a model in which" such orientation "services are delivered by government contracts in light of concerns about that model's efficacy and efficiency."  App. 913; *see also* App. 915 ("EOIR's prior studies indicated that [the Legal Orientation Program] was a wasteful program that should not continue in its current form.").

At the same time, EOIR "recognizes that it is obligated to spend funding that is appropriated for legal orientation services" and that it is required "by statute" to "provide certain legal orientation services to custodians of unaccompanied alien children."  App. 915.  The Acting Director has thus explained that, "[w]hen the operative task orders were terminated," EOIR "was prepared to assume" responsibility for carrying out the services it had previously contracted for through the Legal Orientation Program and Custodians Program.  App. 915-16.

The Acting Director has explained that, to satisfy EOIR's obligations under Section 1232(c)(4), EOIR "will provide legal orientation services to

---

[1] The government had previously issued a stop-work order for many of the task orders under the contract but, shortly thereafter, rescinded that order to ensure compliance with an injunction entered by a different district court.  *See generally* App. 1175-77.

custodians of unaccompanied alien children," which "will include group presentations, self-help written materials, as well as potential outreach to custodians of unaccompanied alien children to ensure that they are aware of the child's upcoming hearings and to reiterate the importance of attending those hearings." App. 917. In addition, the Acting Director has stated that these legal orientation services provided directly by EOIR "will also serve as important steps in identifying mistreatment, exploitation, and trafficking of unaccompanied alien children." *Id.*

With respect to EOIR's obligation "to spend no less than the minimum amount of funding that Congress has specifically appropriated for the 'Legal Orientation Program,'" App. 916, the Acting Director has explained that EOIR is in the process of "determin[ing] how to best utilize federal agency resources" but that "the federalized program continues to provide information to aliens in proceedings about immigration court and other immigration adjudication practices, procedures, and resources," App. 916-17. According to the Acting Director, this "federalized program will be administered by a team of EOIR employees"; "will include Immigration Judges orienting aliens to their rights, obligations, and available legal options"; and will include providing "hard copy and online legal tools such as

self-help legal materials and EOIR's Immigration Court Online Resource," which is "a centralized repository for information and resources about immigration proceedings." App. 901. In addition, the Acting Director has confirmed that "EOIR will exercise its discretion to provide services in the manner that best utilizes resources efficiently and effectively" and will "take appropriate steps to ensure that the minimum level of funding specifically appropriated by Congress" is "obligated and expended as required." App. 917-18.

## B. Procedural Background

1. Plaintiffs are 12 nonprofit organizations that previously received funding through the Acacia Center to provide various legal orientation-related services as subcontractors on Acacia's contract. App. 1044-48. After the Department terminated the operative task orders for those services, Acacia communicated those terminations to its subcontractors, including plaintiffs. *See* App. 1178; *see also* App. 383.

In plaintiffs' operative complaint, they brought three claims relevant to this appeal. First, plaintiffs claimed that the government violated the APA's reasoned-decisionmaking requirements when it terminated the relevant task orders, which plaintiffs characterize as a "termination of the Programs."

App. 1092; *see also* App. 1094 (characterizing the purportedly unlawful actions as "issuing the Termination Order" and "terminating funding for the Programs"). Second, plaintiffs claimed that the government violated the Appropriations Clause of the Constitution by refusing "to spend funds that have been appropriated by Congress." App. 1095. Third, plaintiffs claimed that the government violated 8 U.S.C. § 1232(c)(4) by "cancelling" the Custodians Program. App. 1096.[2] As relief, plaintiffs requested that the district court, among other things, "[s]et aside Defendants' actions that violate the APA, including all attempts and orders to terminate the Programs." App. 1102.

2. Plaintiffs moved for a preliminary injunction, and the parties agreed to consolidate that motion with the district court's resolution of the merits. The parties thus filed cross-motions for summary judgment. *See generally* App. 1183. The district court denied plaintiffs' motions for a preliminary injunction and summary judgment; granted summary judgment to the

---

[2] Plaintiffs also brought claims alleging that the government's actions violated the First Amendment and the separation of powers and were ultra vires. App. 1097-101. The district court rejected each of those claims on the merits, *see* App. 1200-07, and plaintiffs have not advanced any argument that the court erred in doing so. The government thus does not address those claims in this brief.

government on some of plaintiffs' claims; and dismissed plaintiffs' remaining claims for lack of jurisdiction. *See* App. 1210.

The district court first dispensed with the threshold question whether it was entitled to consider declarations from the government or was confined to an administrative record. The court explained that it was entitled to consider declarations "when extra-record sources are needed to identify the agency action at issue" and need not rely on an administrative record to assess its own jurisdiction or whether plaintiffs had a cognizable cause of action. App. 1190.

Although the district court noted that plaintiffs' "challenge has evolved over the course of this litigation," it ultimately concluded that the challenges pertained to two distinct "agency actions": first, the decision to terminate the relevant task orders and thereby "in-source" the services provided by the Legal Orientation and Custodians Programs and discontinue funding the services provided by the Helpdesk Program; and second, the agency's "ongoing implementation and administration of its new, federalized" legal services programs. App. 1191. The court determined to address plaintiffs' challenges to each of those actions in turn.

First, the district court concluded that it lacked jurisdiction to review plaintiffs' challenges to the government's decision to replace the services previously provided under the Legal Orientation Program and Custodians Program task orders with an in-sourced version of those services. The district court explained that Congress has vested the Court of Federal Claims with exclusive jurisdiction over any "action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." App. 1194 (alteration in original) (quoting 28 U.S.C. § 1491(b)(1)). That provision applies not just to procurement of services from outside contractors but also to "the choice to refrain from obtaining outside services." App. 1195 (emphasis omitted) (quoting *Fisher-Cal Indus., Inc. v. United States*, 747 F.3d 899, 902 (D.C. Cir. 2014)).

The district court explained that this provision encompasses plaintiffs' APA challenges to the government's decision to in-source the services previously provided through the Legal Orientation and Custodians Programs. In the court's view, plaintiffs are an "interested party" because they "have a direct interest in Defendants' procurement decisions for" these services. App. 1195 (quotation omitted). And plaintiffs "objec[t] to" the

government's decision to in-source the relevant services rather than procure them from outside contractors by claiming that this choice violated the APA and the relevant statutes. *See* App. 1195-96. Thus, the court concluded, Section 1491(b)(1) divests district courts of jurisdiction over plaintiffs' APA claims related to the Legal Orientation Program and the Custodians Program.

Second, the district court rejected plaintiffs' claims challenging the decision to terminate funding for the Helpdesk Program. In evaluating those claims, the court first concluded that it had jurisdiction over them. Although the court recognized that a different provision of the Tucker Act, 28 U.S.C. § 1491(a)(1), impliedly forbids APA review of claims against the United States that "are, in essence, contractual," the court was "unpersuaded that Plaintiffs' claims regarding the terminatio[n]" of the Helpdesk Program task orders fell within that jurisdictional bar. App. 1197 (quotation omitted). That was so, according to the court, because resolution of plaintiffs' APA claims would not require the court to "examine any agreement negotiated by the parties" but would, instead, require the court to "interpret the APA and the relevant appropriations statutes." *Id.* (alteration and quotation omitted).

On the merits, however, the district court concluded that plaintiffs'
APA claims could not succeed because the agency's decision to terminate
funding for the Helpdesk Program was "committed to agency discretion by
law and therefore unreviewable." App. 1198. The court explained that the
Supreme Court has held "that agencies have discretion to allocate funds in
lump sum appropriations," including unreviewable discretion to "discontinue
[some] program[s]" funded by an appropriation "and reallocate" those funds
to other programs covered by the appropriation. App. 1199. And the court
rejected plaintiffs' argument, based on a Senate Report stating that a portion
of EOIR's "Legal Orientation Program" earmark should be spent on the
Helpdesk Program, that the statute here constrained EOIR's discretion to
discontinue funding that program. The court explained that "the D.C.
Circuit and the Comptroller General have repeatedly recognized" that "the
text of the appropriation"—not any "allocation directions that Congress
makes in committee reports but not in the statutory text"—"is controlling."
App. 1200 (quotation omitted). Because the Senate Report's statement was
not incorporated into the appropriations statute, EOIR was "not legally
obliged to follow" it and it could not constrain EOIR's unreviewable
discretion to reallocate funds away from the Helpdesk Program. *Id.*

Third, the district court concluded that plaintiffs lacked standing to challenge the adequacy of EOIR's continued administration of legal orientation services. The court explained that EOIR's "allegedly inadequate administration" of those services to noncitizens "does not cause any perceptible harm to Plaintiffs in particular." App. 1208 (quotation omitted). In nevertheless attempting to demonstrate standing, plaintiffs argued that EOIR's purported maladministration of those services injured plaintiffs by interfering "with their missions to provide services to individuals in removal hearings" and causing them to want to "fulfill their mission" by "bear[ing] the costs of" providing those services themselves. App. 1209 (alteration and quotation omitted). But, the court explained, the Supreme Court has recently made clear that such alleged intangible harms to an organization's mission do not themselves give rise to standing—even if the organization "spend[s] considerable resources to counteract [that] government action." App. 1209-10 (citing *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024)) (quotation omitted).

## SUMMARY OF ARGUMENT

This case arises out of EOIR's decision to terminate task orders previously issued under the Acacia contract, which ordered (and obligated

EOIR to pay for) legal orientation services provided by plaintiffs. In terminating those task orders, EOIR determined that it would cease funding some of those services altogether and that it would directly provide other services previously provided under the contract through a new federalized model.

The district court concluded that plaintiffs could not advance those claims, for a mixture of threshold reasons. That ultimate conclusion with respect to each claim was correct, although in some cases the jurisdictional and other threshold problems identified by the district court sweep further than the district court realized. Thus, the district court lacked jurisdiction over plaintiffs' challenges to EOIR's termination of the contract task orders, both because those challenges to procurement decisions are barred by 28 U.S.C. § 1491(b) and because those challenges are essentially contractual claims barred by the Tucker Act. The court also lacked jurisdiction over plaintiffs' challenges to the manner in which EOIR is providing legal orientation services moving forward, because plaintiffs have failed to establish Article III standing. And even if the court had subject matter jurisdiction over some or all of plaintiffs' claims, those APA claims could not properly proceed because EOIR's decisions regarding which legal

orientation services to fund through contract, which to provide directly itself, and which to cease funding altogether are committed to agency discretion by law. These threshold barriers to suit render irrelevant plaintiffs' challenges to the state of the administrative record, which is in any event meritless on its own terms.

**I.A.** Because this case arises in the context of a procurement contract, the district court lacked jurisdiction over plaintiffs' claims. 28 U.S.C. § 1491(b) provides the Court of Federal Claims exclusive jurisdiction over any "action by an interested party objecting to," among other things, "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Here, EOIR's decision to discontinue procuring certain services through the Acacia contract in favor of providing them directly itself is a procurement decision, and plaintiffs' challenges to that decision cannot be heard in district court. For similar reasons, plaintiffs' challenges to EOIR's decision to discontinue funding certain services at all are also barred.

**B.** Moreover, the district court also lacked jurisdiction over plaintiffs' claims challenging EOIR's decision to cease funding services through some of the Acacia contract task orders, because those claims are contract claims

that must be brought in the Court of Federal Claims.  The APA provides a limited waiver of sovereign immunity for claims against the United States seeking relief other than money damages provided that another statute does not impliedly preclude review.  Where a party seeks funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA.

The Supreme Court has twice recently stayed district-court orders purporting to void contract terminations in analogous circumstances, concluding that the government was likely to succeed in demonstrating that the district court lacked jurisdiction over claims seeking such relief. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam); *National Insts. of Health v. American Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025).  The Supreme Court's reasoning applies with full force in this case, and the second decision in particular— which issued after the district court's judgment in this case—makes clear that the Court has rejected the arguments plaintiffs have raised here.  Here, as in those cases, plaintiffs have brought claims to enforce a contractual obligation to make funds available and the only source of plaintiffs' asserted rights to the funds are the various contractual instruments in question.

Thus, their claims are essentially contractual and belong in the Court of Federal Claims.

**II.A.**  As the district court properly concluded, plaintiffs lack standing to challenge EOIR's decisions regarding the manner in which to provide legal orientation services to noncitizens, as distinct from EOIR's decision to terminate the contract that funded plaintiffs' delivery of those services. EOIR's delivery of those services does not regulate plaintiffs in any way and does not require that plaintiffs do, or not do, anything.

Nonetheless, plaintiffs argue that EOIR's decisions in this area injure them by undermining plaintiffs' organizational missions to ensure that noncitizens receive effective orientation services and by causing plaintiffs to expend additional funds in response.  But in *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court made clear that standing does not exist when a litigant merely "diverts its resources in response to a defendant's actions." 602 U.S. 367, 395 (2024).  That principle precludes plaintiffs' ability to establish any cognizable injury here.

**B.**  In any event, plaintiffs' claims could not proceed because EOIR's decisions to terminate funding certain services through the Acacia contract and its decisions regarding how to allocate funds among different legal

orientation services are committed to agency discretion by law.  In deciding how to allocate resources, an agency must engage in "a complicated balancing of a number of factors" that are uniquely within the agency's "expertise," including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'"  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

In this case, plaintiffs have failed to demonstrate that any relevant statute or regulation meaningfully constrains EOIR's discretion regarding how to allocate appropriated funds among different potential legal orientation services and different potential providers of those services.  To the contrary, the relevant statutes provide EOIR with broad discretion to allocate its appropriated funding however EOIR determines will most efficiently and effectively deliver legal orientation services to noncitizens.  Plaintiffs cannot challenge the exercise of that discretion through the APA.

**III.**  Plaintiffs are also wrong in arguing that the district court improperly relied on declarations submitted by EOIR's Acting Director and

in arguing that this Court should direct the entry of judgment, or a preliminary injunction, in their favor.

As to the first argument, plaintiffs are wrong three times over. The threshold problems with plaintiffs' suit do not turn on any of the facts developed in those declarations, and so the court's decision to admit those declarations into the record provides no basis to vacate the district court's judgment. Regardless, the declarations—provided by the Acting Director of EOIR, the relevant agency decisionmaker—properly elucidate the considerations undergirding the agency's decision at the time. And as the district court explained, even if those declarations are not properly part of the administrative record in this case, the courts may still rely on them in determining whether plaintiffs have established the existence of jurisdiction and a cause of action.

As to the second argument, plaintiffs nowhere in their briefs develop any argument on the merits of their claims, nor do they meaningfully explain why the relevant equitable factors support the entry of a preliminary injunction. They have thus provided no compelling reason for this Court to depart from its general practice of allowing the district court to address any remaining issues on remand in the first instance.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment and its dismissal of claims for lack of subject matter jurisdiction de novo. *See Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 385 (D.C. Cir. 2018).

## ARGUMENT

## I. The District Court Lacked Jurisdiction over Plaintiffs' Claims Challenging EOIR's Termination of Task Orders Under the Acacia Contract

### A. Plaintiffs' Claims Challenging the Termination of Task Orders Are Barred as Improper Challenges to Procurement Decisions

As the district court properly concluded, plaintiffs' claims challenging EOIR's decision to in-source services rather than procure them from outside contractors founder on the jurisdictional limitation contained in 28 U.S.C. § 1491(b). As relevant here, that statute provides exclusive jurisdiction to the Court of Federal Claims over any "action by an interested party objecting to," among other things, "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.*; *see also* App. 1194 (explaining that although Section 1491(b) as enacted— and as still reflected in the U.S. Code—provided concurrent jurisdiction over such suits to the Court of Federal Claims and district courts, Congress

provided for the expiration of district courts' jurisdiction under that provision as of 2001).

As this Court has explained—relying on Federal Circuit precedent— the scope of Section 1491(b)'s exclusive jurisdiction is broad, reaching challenges that "involv[e] a connection with any state of the federal contracting acquisition process, including the process for determining a need for property or services" in the first place. *Fisher-Cal Indus., Inc. v. United States*, 747 F.3d 899, 902 (D.C. Cir. 2014) (quotation omitted). Thus, Section 1491(b) covers both challenges to procurement contracts that are awarded and challenges to the government's decision *not* to procure services. *See id.* (explaining that the procurement "process begins" with "the process for determining a need for property or services" and that Section 1491(b) thus "includes the choice to *refrain* from obtaining outside services" (alteration and quotation omitted)).

Relying on that precedent, the district court properly concluded that plaintiffs' challenges to the termination of the task orders for the Legal Orientation Program and the Custodians Program—the two programs whose services EOIR intends to provide itself—fall outside the jurisdiction of the district courts. As the district court explained, by choosing to provide those

services itself rather than through a contractor, EOIR has in-sourced those services, and any challenge based on any statute—including the APA—to that decision may not be heard in district court. *See* App. 1195. That provision thus bars plaintiffs' attempt to challenge EOIR's actions in terminating the task orders for those two programs and replacing the contractor services for those programs with EOIR's own internal services.

Moreover, although the district court limited its analysis under this provision to the two task orders that EOIR has determined to in-source (rather than merely terminate without replacement), Section 1491(b)'s jurisdictional sweep is not so limited. As *Fisher-Cal* explains, the "procurement" processes covered by Section 1491(b) begin with determining whether there is "a need for property or services." 747 F.3d at 902 (quoting 41 U.S.C. § 111, an analogous statute that the Federal Circuit has looked to in determining the reach of Section 1491(b)). And the outcome of that determination may be not only that an agency determines to in-source the services or to obtain them from an outside contractor but also that the agency determines that it has no "need for" the services at all. That is precisely what happened with EOIR's termination of the task order for the Helpdesk Program, which reflects EOIR's conclusion that it does not wish to

provide those services itself or to procure them from an outside vendor. Thus, just like plaintiffs' challenges to EOIR's in-sourcing of the Legal Orientation Program and Custodians Programs, plaintiffs' challenges to EOIR's termination of the Helpdesk Program are likewise barred by Section 1491(b).

In response, plaintiffs do not dispute that the Acacia contract is a procurement contract. Instead, plaintiffs primarily contend (at 56-59) that Section 1491(b) only applies to "claims alleging violations of *procurement* laws and regulations"—and apparently not to claims alleging violations of the APA or other statutes. But even assuming that courts could feasibly divide statutes into "procurement" statutes and "other" statutes, the text of Section 1491(b) contains no such division; it applies by its own terms to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1). The statutory structure thus reinforces that it is the violation that must be connected to procurement; there is no such thing as a "statute . . . in connection with a procurement." And indeed, although the APA itself may not apply to procurement determinations, the Court of Federal Claims is required to apply "the standards set forth in" the APA when reviewing any challenge brought

under Section 1491(b).  *See id.* § 1491(b)(4).  Thus, the Court of Federal Claims routinely resolves challenges under Section 1491(b) that look exactly like the sort of APA challenges plaintiffs advance here, despite plaintiffs' averment (at 58) that they are only aware of Section 1491(b) cases that are "inextricably connected to claims alleging violations of *procurement* laws." *See, e.g.*, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001) (reviewing whether contracting officer's determination was "arbitrary").

Nor can plaintiffs avoid the logic of *Fisher-Cal* by claiming that they challenge the "decision to end the Programs" rather than any decision to in-source the relevant services.  Opening Br. 56.  The "Programs" that plaintiffs reference are simply two sets of services that EOIR procured through specific task orders under the Acacia contract; the "Programs" have no content independent of those task orders.  EOIR has now decided to terminate the task orders covering those "Programs" and to provide analogous services itself.  Thus, when plaintiffs say they challenge EOIR's "decision to end the Programs," what they mean is that they challenge EOIR's decision to terminate the task orders.  That challenge is barred by Section 1491(b).  And even if EOIR were not providing those services itself

but instead simply terminating its procurement of the services, plaintiffs'

challenges would nevertheless remain barred, as already explained.[3]

### B. Plaintiffs' Challenges Are Also Barred by the Tucker Act

1. The federal government is "immune from suit in federal court

absent a clear and unequivocal waiver of sovereign immunity." *Crowley

Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although

the APA provides "a limited waiver of sovereign immunity for claims against

the United States" seeking relief other than money damages, *id.*, that waiver

does not apply "if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish*

---

[3] It does not matter, for these purposes, whether the district court was correct in concluding that plaintiffs were "interested parties" and thus could bring challenges under Section 1491(b). *See Percipient.ai, Inc. v. United States*, No. 23-1970, slip op. at 2 (Fed. Cir. Aug. 28, 2025) (en banc) (holding that an "interested party" for Section 1491(b) purposes includes only "an actual or prospective bidder or offeror"—not a subcontractor—"whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). It would make no sense to allow parties with no right to challenge the procurement to bring APA claims while forbidding the parties with actual rights under the contracts to bring those claims. *Cf. FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1995 n.8 (2025) (explaining that when Congress creates a "cause of action enabling [some parties] (and not [others]) to seek judicial review," it would "frustrat[e] that scheme" to allow those other parties "to sue under the APA"). And plaintiffs have not asserted on appeal that this distinction makes any difference.

28

*Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to require the government to continue to perform its obligations under a contract, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). As this Court has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court has looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

The Supreme Court has twice recently stayed district-court orders requiring the government to make payments based on grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act provides the Court of Federal Claims jurisdiction over such suits. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). In *California*, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

More recently—after the district court's decision in this case—the Supreme Court has reiterated *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal contracts] or to order relief designed to enforce any obligation to pay money pursuant to those" contracts. *National Insts. of Health v. American*

30

*Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (quotation omitted).  Thus, the Supreme Court has now made doubly clear that challenges to agency "decisions terminating existing" contracts— including challenges brought "under the [APA]"—likely "belong in the Court of Federal Claims." *Id.* at *1-2 (Barrett, J., concurring); *see also id.* at *4 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part) (similar).

The district court lacked jurisdiction over plaintiffs' claims here for the same reasons.  As in *California* and *National Institutes of Health*, plaintiffs in this case allege that the government has violated "a contractual obligation to pay money" assertedly embodied in the Acacia contract.  *California*, 145 S. Ct. at 968 (quotation omitted).  Thus, throughout this litigation, plaintiffs have made clear that their primary complaint is that the government unlawfully terminated the task orders associated with that contract, which funded the provision of services through the three Programs plaintiffs identify.  *See, e.g.*, App. 1092 (complaining that EOIR failed to provide a "reasoned justification for the abrupt termination of the Programs" and "underlying contract"); App. 1093 (asserting that the "Termination Notice" was unlawful); App. 1094 (identifying the relevant "unlawful actions of

issuing the Termination Order" and thereby "terminating funding for the Programs"). And as in *California* and *National Institutes of Health*, the contract here was awarded by the Department to Acacia from a generalized appropriation, which means that the source of plaintiffs' purported rights to payment can only be the Acacia contract (and various subcontracts and task orders), not any statute.

The harm that plaintiffs alleged and the relief they sought from the district court underscores that this dispute is, at base, contractual. Plaintiffs' concern is the loss of federal funds. *See, e.g.*, Opening Br. 70 (complaining about the "devastating financial harms" that plaintiffs assert from the loss of funds). To remedy that asserted harm, plaintiffs sought an order vacating the government's termination of the relevant task orders—and thus requiring the continued payment of funds pursuant to the government's contractual obligations. *See* App. 1102.

2. In nonetheless concluding that plaintiffs' claims challenging EOIR's termination of the Acacia contract task orders were not essentially contractual claims precluded by the Tucker Act, the district court—which did not have the benefit of the Supreme Court's more recent decision in *National Institutes of Health*—relied on its view that resolving plaintiffs'

claims would not require examining any contract but instead "interpret[ing] the APA and the relevant appropriations statutes."  App. 1197 (quotation omitted) (citing *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting), *vacated in part*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (per curiam)).

That is the same reasoning that the First Circuit relied on in *National Institutes of Health*, as to which the Supreme Court subsequently granted a stay.  The First Circuit concluded that the Supreme Court's decision in *California* could be distinguished on the ground that "at least one of" the "claims for relief in *California* depended on the terms and conditions of the grant awards," while the relief at issue in that case was issued "under the APA independent of any contractual language."  *American Pub. Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 52 (1st Cir. 2025).

In issuing a stay, the Supreme Court thus made clear that the mere invocation of the APA, as opposed to contract terms, makes no difference to the applicability of the Tucker Act.  And that conclusion controls this case. As explained, plaintiffs have not identified any statutory right to the continued funding of the Acacia contract and the relevant task orders; instead, any right to federal funds—and any obligation to continue making

those funds available—necessarily stems from the relevant contractual instruments.

That conclusion in any event follows from this Court's precedents. As *Megapulse* observed, any contractual claim could be recharacterized as an arbitrary-and-capricious claim, 672 F.2d at 967 & n.34, and so a general right to be free from arbitrary-and-capricious decisionmaking is no substitute for a substantive right upon which the claim is premised.

In addition, in the relevant respects, this case is thus much like *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985). There, a government contractor encountered difficulties performing the contract; the government invoked a liquidated damages provision and, as a result, withheld payments under the contract. *Id.* at 892. The contractor sued, claiming that the government had violated statutory procedures in withholding the payments. *Id.* This Court held that the suit had to go to the Court of Federal Claims. The Court explained that the plaintiff sought "an injunction requiring the government to pay monies owed" and that the "right to these payments is created in the first instance by the contract, not by the" relevant statute. *Id.* at 894. In other words, the statute "confers no such right in the absence of the contract itself." *Id.* The requested remedy was

thus "the classic contractual remedy of specific performance" and the suit was barred, *id.*—even though, presumably, resolving plaintiffs' statutory claim would have required evaluating the statute rather than the terms of the contract. *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("The question presented by the complaint could be phrased as whether the contract forbids termination under these conditions. That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action."). So too here.

Nor is this case similar to *Widakuswara* in the relevant respect. Regardless whether the en banc Court's stay decision—which also predated the Supreme Court's recent decision in *National Institutes of Health*— reflected how that case should ultimately come out on the merits, that case involved allegations that the relevant statutes "required allocation of funds to th[e] specific, named" plaintiffs. *Widakuswara*, 2025 WL 1288817, at *11 (Pillard, J., dissenting). Even if claims to enforce that asserted statutory entitlement could proceed in district court, in this case, it is only the relevant

contractual instruments—not any statute—that entitle any particular plaintiff to receive federal funds.

Nor do plaintiffs persuade by contending that they may avoid the Tucker Act so long as they seek not "contractual relief" but instead equitable relief that "has considerable value independent of any future potential for monetary relief." Opening Br. 62 (quotation omitted). For one, plaintiffs' purported distinction (at 62) between "contractual relief," such as an order of "specific performance," and declaratory or injunctive relief is nonsensical. A declaratory judgment or injunction that effectively requires the government to perform contractual obligations is "contractual relief" in the nature of specific performance. That is exactly what plaintiffs seek here. And in this respect, plaintiffs' request for relief is no different from the relief requested in—and thus cannot provide any basis to distinguish—*California* and *National Institutes of Health*.

Moreover, plaintiffs' attempt to invoke the independent-value test is misguided. Plaintiffs draw that test from this Court's decision in *Kidwell v. Department of the Army, Board for Correction of Military Records*, 56 F.3d 279 (D.C. Cir. 1995). But *Kidwell* did not involve a contract with the government at all. Thus, the Court in that case had no occasion to address

whether the plaintiff's claim constituted an essentially contractual claim that must be brought pursuant to the Tucker Act rather than the APA. Instead, the Court's analysis focused on the distinct question whether plaintiffs effectively sought "money damages." *Kidwell*, 56 F.3d at 284.

That distinction flows from the fact that the APA contains two different limitations on review. First, the APA does not permit the maintenance of a suit seeking "money damages." 5 U.S.C. § 702. Second, and separately, the APA does not permit the maintenance of a suit "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* *Kidwell*—and plaintiffs' associated arguments regarding the proper characterization of the relief they seek—focuses on the first of those limitations, but the fundamental problem with plaintiffs' suit is the second.

## II. Plaintiffs' Attempt to Challenge the Manner in Which the Government Is Providing Legal Orientation Services Is Unavailing

### A. Plaintiffs Lack Standing to Challenge the Manner in Which EOIR Is Providing the Relevant Services

1. In addition to plaintiffs' challenge to EOIR's decision to terminate its procurement of legal orientation services from outside contractors, plaintiffs also contend that EOIR's own delivery of legal orientation services

37

to noncitizens is inadequate in various ways. The district court correctly recognized that plaintiffs do not have standing to advance this challenge.

In attempting to demonstrate standing to challenge the way in which EOIR delivers services to others, plaintiffs advance a theory of organizational standing that is incompatible with the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). In general, organizations may "sue on their own behalf for injuries they have sustained." *Id.* at 393 (quotation omitted). Like all litigants, however, organizations must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Id.* at 393-94. Here, plaintiffs have attempted to meet these requirements by stating that EOIR's purported inadequate delivery of services has injured plaintiffs' "organizational missio[n]" of ensuring that noncitizens receive adequate legal orientation services and that plaintiffs have "used [their] resources to counteract that harm." Opening Br. 41-42 (quotation omitted).

The Supreme Court squarely rejected that theory in *Alliance for Hippocratic Medicine*. In particular, the Court squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "[t]hat is incorrect." *Alliance*

*for Hippocratic Med.*, 602 U.S. at 395.  In that case, associations that challenged FDA's relaxation of "regulatory requirements for mifepristone, an abortion drug," *id.* at 372-73, 376, claimed that in response to FDA's changed policies they had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks" and incurred various other expenses, *id.* at 394.  They also alleged that FDA had failed to "properly collec[t] and disseminat[e] information about" mifepristone and thereby made "it more difficult" for the plaintiffs "to inform the public about safety risks" of the drug.  *Id.*

As the district court explained, plaintiffs' claim here is no different. Plaintiffs' contention is that EOIR is failing to properly administer legal orientation services to noncitizens.  Thus, for example, plaintiffs "fault [EOIR] for relying on online self-help materials to deliver services, arguing that web-based, as opposed to in-person, programming is insufficient," and plaintiffs complain that EOIR's federalized model "describes materials that already exist" rather than new materials.  App. 1207 (alteration and quotation omitted omitted); *see also* Opening Br. 47 (faulting EOIR for providing only English-language materials in one detention facility and for employing posters to deliver information in another facility).  In plaintiffs'

view, the manner in which EOIR intends to provide these services moving forward "cannot meet [EOIR's] statutory and constitutional obligations" to noncitizens.  App. 1207 (quotation omitted).  And plaintiffs complain (at 43) that EOIR's purported insufficient services have "harmed [plaintiffs'] organizational interests" and "missions," which they describe as ensuring that noncitizens are properly educated "regarding their legal alternatives, rights, and obligations in immigration proceedings."  In other words, plaintiffs' fundamental contention is that EOIR's actions "undermin[e] Plaintiff organizations' respective missions to provide information, counseling, referrals, and other services to *pro se* noncitizens."  App. 1095.  These generic setbacks to their mission, and the costs incurred as a result, are no different from the allegations rejected in *Alliance for Hippocratic Medicine*.

2.  Plaintiffs' attempt to nonetheless identify a cognizable injury stemming from EOIR's actions is unpersuasive.  At the outset, plaintiffs err in relying on older precedent of this Court to contend that an organization has standing so long as it can demonstrate that "the agency's action or omission to act injured the [organization's interest]" and "the organization [has] used its resources to counteract that harm."  Opening Br. 42

(alterations in original) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

But as explained, that framework for assessing organizational standing is irreconcilable with the Supreme Court's more recent decision in *Alliance for Hippocratic Medicine*. There, the Supreme Court made clear that an organization (like any other litigant) may not establish cognizable injury based on asserted harm to its "interests." *Alliance for Hippocratic Med.*, 602 U.S. at 394 (quotation omitted). And the Court squarely considered the question whether "standing exists when an organization diverts its resources in response to a defendant's actions" and concluded that such a theory of standing "is incorrect." *Id.* at 395; *see also People for the Ethical Treatment of Animals*, 797 F.3d at 1099 (Millett, J., dubitante) (explaining that this Court's older diversion-of-resources precedent is "hard to reconcile" with ordinary standing principles).

Plaintiffs contend (at 42) that this Court "ha[s] continued to apply" the framework they identify "after *Alliance for Hippocratic Medicine*," but they do not identify any favorable case for them. Instead, they cite *Center for Biological Diversity v. U.S. Department of the Interior*, 144 F.4th 296 (D.C. Cir. 2025), which rejected the organizational plaintiff's theory of standing

41

even under this Court's previous precedents. *Id.* at 314-15. This Court thus had no occasion to specifically consider whether the framework identified in those precedents can be reconciled with *Alliance for Hippocratic Medicine*.

Indeed, far from reaffirming those precedents, the Court specifically noted that *Alliance for Hippocratic Medicine* "described *Havens Realty*— the foundation of [this Court's] organizational injury precedents—as an 'unusual case' and cautioned against extending it beyond circumstances in which the challenged action 'directly affected and interfered with [a plaintiff's] core business activities.'" *Center for Biological Diversity*, 144 F.4th at 315 (second alteration in original) (quoting *Alliance for Hippocratic Med.*, 602 U.S. at 395-96). And as Judge Millett has explained, the *Havens Realty* decision is best understood as standing for the unremarkable proposition that an organizational plaintiff can establish standing by showing that the defendant acted directly on the plaintiff organization in a way that impeded the plaintiff's ability to carry it out its mission. *See People for the Ethical Treatment of Animals*, 797 F.3d at 1100 (Millett, J., dubitante) (noting that in *Havens Realty*, the defendant apartment owner had unlawfully provided misinformation to the plaintiff organization).

Plaintiffs fare no better in shifting gears and contending that EOIR's actions have harmed plaintiffs by denying them access they previously enjoyed to immigration facilities and to information about detainees and court dockets. *See* Opening Br. 44-45. These asserted injuries are not traceable to the agency action that plaintiffs challenge, in two respects.

For one, any alleged inadequacies in the legal orientation services that EOIR is providing to noncitizens are wholly disconnected from plaintiffs' complaints about their own denial of access to facilities and information. As the district court explained, plaintiffs' claims center around allegations that EOIR is providing "inadequate" legal orientation services, such as by improperly relying on "online self-help materials" rather than "in-person" programs. App. 1207 (quotation omitted). In advancing those claims, plaintiffs have focused on the services EOIR is providing to noncitizens— plaintiffs have not, by contrast, focused these claims on the way in which EOIR is interacting with plaintiffs. To the contrary, plaintiffs do not—and could not reasonably—contend that EOIR has any statutory obligation to provide them with special access to immigration facilities or to information about detainees and court dockets.

Thus, to the extent that plaintiffs' primary claim to injury comes in the form of a complaint about their lack of access to facilities and information, that theory of injury is not connected to their claim on the merits. Nor, for similar reasons, could that claimed injury be redressed in this suit. Regardless of the quality of the services provided by EOIR, plaintiffs present no basis for an order requiring EOIR to provide plaintiffs with special access to facilities or information.

Rather, to the extent that plaintiffs' effort to obtain special access is connected to one of their claims, it is the contract claim. As the district court explained in rejecting plaintiffs' First Amendment challenge (a claim that plaintiffs do not raise on appeal), the "principal justification for the revocation of Plaintiffs' special access rights is that Plaintiffs are no longer government subcontractors, leading [EOIR] to reasonably conclude that Plaintiffs should have the same access rights as any other member of the public." App. 1204 (quotation omitted). As explained, the district court lacked jurisdiction to review that termination, and plaintiffs cannot properly manufacture standing to challenge EOIR's separate actions in implementing the federalized program by relying on injuries stemming from the termination.

For similar reasons, as the district court explained, plaintiffs likewise cannot generate standing to challenge the quality of EOIR's services by asserting an injury in the form of a loss of contract funds. Those financial injuries are not traceable to—and would not be redressable by relief regarding—EOIR's separate actions in its ongoing provision of those services. And plaintiffs' assertion (at 52-53) that they could receive federal funds indirectly if EOIR were to award a contract to other providers instead of providing services itself does nothing to establish that plaintiffs are harmed by any asserted maladministration of the services being provided.

## B. The Challenged Decisions Are Committed to Agency Discretion by Law

Even if the district court had jurisdiction over plaintiffs' challenges, those challenges would fail at the threshold because the relevant agency decisions are committed to agency discretion by law. As the district court correctly recognized, plaintiffs' attempt to challenge EOIR's decision to cease funding the services provided under the Helpdesk Program cannot proceed because the relevant statutes do not require EOIR to maintain that program and do not constrain EOIR's discretion to reallocate funding away from those services to other legal orientation services. Moreover, although the district court did not need to reach this issue given its jurisdictional

45

holdings, plaintiffs' challenges to EOIR's funding allocation decisions with respect to the Legal Orientation Program and Custodians Program fail for the same reason. Although the relevant appropriations statute earmarks funds for legal orientation services generally, nothing in that statute—or in any substantive law—relevantly constrains EOIR's discretion to determine which legal orientation services to fund or how to fund those services.

1. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards. *See id.* at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Thus, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly

within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise, such as from contractual terms), courts may not "intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, this Court has made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly requir[e]

a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

2. As the district court properly recognized, those principles preclude plaintiffs' attempt to seek APA review of EOIR's decision to terminate funding for the Helpdesk Program. *See* App. 1198-200. And although the district court did not reach the question, those principles similarly preclude plaintiffs' challenge to the manner in which EOIR has allocated funding for legal orientation services more broadly.

In this case, the relevant appropriations statute contains two provisions. First, Congress funded EOIR's activities generally with a lump-sum appropriation of $844,000,000 for "expenses necessary for the administration of immigration-related activities of" EOIR. Pub. L. No. 118-42, 138 Stat. at 133; *see also* App. 1173 (explaining that Congress has continued funding at this amount through September 30, 2025). Second, Congress provided that "not less than $28,000,000" of that lump-sum appropriation "shall be available for services and activities provided by the Legal Orientation Program." Pub. L. No. 118-42, 138 Stat. at 133.

Nothing in the text of those appropriations constrains EOIR's discretion regarding whether to continue funding the services previously

provided through the Helpdesk Program.  To the contrary, the appropriations "leav[e] it to" EOIR to "distribute the funds among some or all of the permissible objects as it sees fit."  *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984).  And because the statute does not so much as mention the Helpdesk Program, nothing in the statute prohibits EOIR from exercising its discretion to terminate the task order for, and cease funding the services previously provided through, that program in favor of expending the funds on other permissible objects of the appropriations.  Nor does anything in the statute provide any justiciable standard for evaluating EOIR's decision to do so.  Thus, as the district court explained, because the statute "does not contain any specific requirement that EOIR operate" the Helpdesk Program or "appropriate money specifically for" that program, EOIR has unreviewable "discretion to discontinue its use of the earmarked funds for that specific program."  App. 1200.

Moreover, although the district court did not need to reach this question in light of its jurisdictional holdings, those same principles preclude plaintiffs' attempt to seek APA review of EOIR's decisions regarding which legal orientation services to fund.  Congress has earmarked a portion of

EOIR's lump-sum appropriation for "services and activities provided by the Legal Orientation Program."  Pub. L. No. 118-42, 138 Stat. at 133.  That earmark may require EOIR to expend the specified funds on the covered services and activities, but nothing in the earmark provides any additional constraints on EOIR's determinations of which legal orientation services and activities to fund.  Instead, the earmark leaves it to EOIR's discretion to allocate its limited funds among different legal orientation services in the manner that it considers best.

Here, EOIR has made clear that it intends to spend the earmarked funding on "legal orientation services" and that it recognizes that other statutory obligations require it to "provide certain legal orientation services to custodians of unaccompanied alien children."  App. 915.  But EOIR has determined that the previous model of procuring those services from outside contractors was "wasteful" and led to concerns about the services' "efficacy and efficiency."  App. 913, 915.  Thus, EOIR has exercised its discretion to discontinue the previous model and to instead directly "provide services in the manner that best utilizes resources efficiently and effectively."  App. 917-18.  Nothing in the statute constrains—much less constrains in a judicially enforceable way—that exercise of the agency's discretion.

3. In response to the district court's conclusion that EOIR's termination of funding for the Helpdesk Program is committed to agency discretion by law, plaintiffs do not dispute the general legal principle that an agency's allocation of lump-sum appropriations among different programs is not subject to judicial review. Instead, plaintiffs contend (at 64-68) only that the statutory earmark for "services and activities provided by the Legal Orientation Program," Pub. L. No. 118-42, 138 Stat. at 133, requires EOIR to continue funding the Helpdesk Program in particular. That is so, according to plaintiffs, because the relevant legislative history reflects that Congress understood the Helpdesk Program to be a "Legal Orientation Program" and that the Senate wished to continue funding the program. *See* Opening Br. 64-67; *see also* S. Rep. No. 118-62, at 85 (2023) (providing that the Senate Committee's funding recommendation "includ[es] $5,000,0000 for the operation of the" Helpdesk Program and that the Committee "directs the Department to continue" the services and activities of that program). The district court properly rejected that contention.

To the extent that plaintiffs' argument is merely meant to establish that the Helpdesk Program was a "Legal Orientation Program"—and, thus, EOIR could have permissibly used the earmarked appropriation to fund the

Helpdesk Program—the point is undisputed.  But nothing in the statute provides that EOIR is required to continue funding all previously established "Legal Orientation Programs."  Instead, the earmark provides only that EOIR shall spend the covered funds on activities and services provided through the Legal Orientation Program—and, as explained, EOIR intends to comply with that limitation by expending the funds on the federalized delivery of those services.

To the extent that plaintiffs rely on the Senate Report to establish that Congress directed EOIR to continue to fund the Helpdesk Program in particular, they cannot overcome the hurdle that the Senate Report is not a statute.  As this Court has explained in a similar context, the relevant question "is not how Congress expected or intended [EOIR] to behave, but how it *required* [EOIR] to behave, through the only means by which it can" establish requirements: "the enactment of legislation."  *International Union*, 746 F.2d at 860-61.  In other words, "indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency."  *Lincoln*, 508 U.S. at 192 (quotation omitted); *see also* App.1200 (explaining that the Comptroller General, a Legislative Branch official, has also recognized that "the text of

the appropriation"—not any "allocation directions that Congress makes in committee reports but not in the statutory text"—"is controlling" (quotation omitted)).  And indeed, plaintiffs' contention (at 65-66) that legislative history "is particularly helpful" and "uniquely authoritative" for "appropriations statutes" because Congress sometimes "takes steps to bind agencies to statements contained therein" by incorporating them into the statute only underscores that Congress did not purport to bind EOIR with respect to the Senate Report statements at issue in this case.

This case is therefore on all fours with *Lincoln* itself.  There, the relevant statute directed the agency to expend funds "'for the benefit, care, and assistance of the Indians,' for the 'relief of distress and conservation of health.'"  508 U.S. at 185 (quoting 25 U.S.C. § 13).  Consistent with those goals, the agency developed the Indian Children's Program to provide certain services "for Indian children with emotional, educational, physical, or mental handicaps"; it operated that program for a number of years and "repeatedly apprised Congress of the Program's continuing operation."  *Id.* at 185-87.  Nonetheless, although Congress was certainly aware of the program, that awareness did "not translate through the medium of legislative history into legally binding obligations."  *Id.* at 194.  Instead, the

agency retained unreviewable discretion to terminate the program and reallocate funds to other activities "fall[ing] within the Service's statutory mandate to provide health care to Indian people." *Id.* Similarly here, although Congress was aware of the Helpdesk Program—and although EOIR could have permissibly used the earmark to continue funding that program—nothing in the relevant statute constrains EOIR's determination to reallocate funds to the provision of other legal orientation services.

## III. Plaintiffs' Remaining Arguments Fail

In addition to disputing the district court's conclusions that plaintiffs could not properly advance the claims they brought in this suit, plaintiffs also advance two other arguments. First, plaintiffs argue (at 29-36) that the district court erred in relying on declarations submitted by the government describing EOIR's plan to expend the relevant appropriation and comply with the agency's statutory obligations by providing certain legal orientation services itself. Second, plaintiffs briefly state (at 70-71) that if this Court disagrees with the district court's threshold determinations, it should direct the entry of judgment in plaintiffs' favor or a preliminary injunction. Plaintiffs are wrong on both counts.

1. Plaintiffs err in arguing that the district court's judgment should be vacated because the court relied on facts that were not properly part of the administrative record—namely, the declarations submitted by EOIR describing EOIR's plan to provide certain orientation services moving forward.

At the outset, this Court need not resolve plaintiffs' challenge to the district court's reliance on those declarations for the limited purpose of ascertaining the relevant agency action at issue because the correct outcome of this appeal does not turn on those facts. As explained throughout this brief, the district court lacked jurisdiction to consider plaintiffs' claims challenging EOIR's decision to terminate the relevant task orders; plaintiffs lack Article III standing to challenge the manner in which EOIR continues to deliver legal orientation services; and EOIR's determinations regarding how to allocate its resources among different such services are committed to agency discretion by law. None of those conclusions turns on the specific ways in which EOIR is operating the ongoing federalized delivery of services—or even whether EOIR is currently providing those services at all. Thus, this Court may properly affirm without relying on the facts reflected in

the disputed declarations, rendering academic any dispute about the permissibility of relying on that information.

Moreover, plaintiffs are wrong to suggest that the declarations are *post hoc* rationalizations and, thus, that considering them would violate the principles announced in *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). As an initial matter, the record-review rule discussed in *Chenery* has no application here, where plaintiffs' claims founder at the threshold. That rule has force when "applying th[e APA's] standard" asking whether agency action was arbitrary and capricious. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). But as the district court recognized, *see* App. 1191, when determining whether the court has jurisdiction or plaintiffs have a cognizable cause of action, courts are not so limited to the administrative record. Indeed, as this Court has explained, "where there is no cause of action for substantive judicial review" of an agency decision, there "is no need to create a record for judicial review." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). In such circumstances, then, courts necessarily must rely on extra-record materials to determine whether a cause of action exists in the first place. Here, the district court made clear that it was using the

declarations to determine what agency action had been challenged, not to assess the validity of that agency action. *See* App. 1189-91.

In addition, even if the *Chenery* principle applied, it would not preclude reliance on the declarations. The Acting Director has made clear that the basic considerations regarding the comparative efficiency of EOIR-led and contractor-led delivery of services described in her declarations "informed the determination" to in-source certain services "following the termination of the operative task orders on April 16." App. 916. And as this Court has made clear, a reviewing court may consider post hoc declarations as part of APA review so long as they "accurately reflec[t] the contemporaneous reasoning of the Department." *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019).

That principle is especially applicable in this case, for two reasons. First, the declarations in question were provided by the Acting Director, who was "the relevant agency decisionmaker" and whose "reasoning is" thus "the proper subject of [the Court's] review." *Rhea Lana*, 925 F.3d at 524. Second, the declarations do not reflect some "entirely new theory"; instead, "they illuminate the reasons that are already implicit in the internal materials." *Id.* (alteration and quotation omitted). The underlying materials

in this case reflect that, in approaching the decision to terminate part of the Acacia contract, EOIR was sensitive to its own statutory obligations to ensure the delivery of some—but not all—of the services provided under that contract. *See* App. 1177-78. The disputed declarations simply provide additional detail regarding how EOIR is choosing to fulfill those obligations.

Nor are plaintiffs correct when they suggest (at 36) that they are entitled to discovery regarding the declarations. For one, as explained, the specific facts put forward in the declarations are irrelevant to the question whether plaintiffs' claims could properly proceed in district court. There is thus no need for discovery into those facts. And regardless, plaintiffs themselves admit (at 36) that discovery is only proper in APA cases when the record reflects "a strong showing of bad faith or improper behavior" on the part of the government. *Department of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation omitted). This case has nothing of the sort.

And to the extent that plaintiffs complain that the declarations reflect an evolution in the specifics of EOIR's plans, that evolution does not reflect bad faith. It instead reflects the simple fact that the agency's work "to implement this federalized program and determine how to best utilize federal agency resources" "remains ongoing." App. 916. And the evolving

nature of the agency's actions only highlights plaintiffs' error in trying to challenge EOIR's delivery of services prospectively, rather than waiting for a specific final agency action. *Cf. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (making clear that a plaintiff may only use the APA to challenge "some particular 'agency action' that causes it harm" rather than to seek prospective, "wholesale improvement of [government] program[s] by court decree" (emphasis omitted)).

2. Finally, even assuming plaintiffs could succeed on one or more of the arguments before this Court, they plainly have not established that this Court should direct the entry of judgment in plaintiffs' favor or a preliminary injunction. *But see* Opening Br. 70-71. Although plaintiffs' brief disputes the jurisdictional and other threshold conclusions reached by the district court, plaintiffs nowhere meaningfully develop any argument on the merits of their claims. That alone precludes entering judgment or a preliminary injunction.

Nor do plaintiffs fully develop any arguments regarding the irreparable harm they claim to be suffering or the reasons why the balance of the equities and the public interest would support issuing a preliminary injunction in this case. *But see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (explaining that to justify a preliminary injunction, a

plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest").

In these circumstances, plaintiffs have failed to justify any request for this Court "to deviate from [its] general practice of remanding for the district court to address" any outstanding "arguments in the first instance"—a practice that the Court commonly follows even when the parties have briefed the relevant arguments. *Rtskhiladze v. Mueller*, 110 F.4th 273, 278 n.6 (D.C. Cir. 2024) (quotation omitted). Thus, if this Court agrees with plaintiffs that some or all of the claims that they discuss in this appeal are properly brought in district court, this Court should vacate the district court's judgment and remand to allow that court to address the merits of those claims and any other relevant arguments in the first instance.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11958 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

 /s/ Sean R. Janda
Sean R. Janda

# ADDENDUM

## TABLE OF CONTENTS

5 U.S.C. § 702 ........................................................A1

28 U.S.C. § 1491 ..................................................A1

**5 U.S.C. § 702**

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**28 U.S.C. § 1491**

### § 1491. Claims against United States generally; actions involving Tennessee Valley Authority

(a) (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such

judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 1 of that Act.

(b) (1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(5) If an interested party who is a member of the private sector commences an action described in paragraph (1) with respect to a public-private competition conducted under Office of Management and Budget Circular A–76 regarding the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office

of Management and Budget Circular A–76, then an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action.

(6) Jurisdiction over any action described in paragraph (1) arising out of a maritime contract, or a solicitation for a proposed maritime contract, shall be governed by this section and shall not be subject to the jurisdiction of the district courts of the United States under the Suits in Admiralty Act (chapter 309 of title 46) or the Public Vessels Act (chapter 311 of title 46).