ORAL ARGUMENT SCHEDULED FOR OCTOBER 14, 2025

**No. 25-5254**

═══════════════════════════════════════════════════

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

AMICA CENTER FOR IMMIGRANT RIGHTS et al.,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF JUSTICE et al.,
Defendants-Appellees.
_____

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-CV-00298-RDM
Before the Honorable Randolph D. Moss

_____

**PLAINTIFFS-APPELLANTS' REPLY BRIEF**
_____

GIBSON DUNN & CRUTCHER
LLP

Amer S. Ahmed
Richard W. Mark
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

Laura M. Sturges
Caelin Moriarity Miltko
1900 Lawrence Street, Ste. 3000
Denver, CO 80202-2211
(303) 298-5700

AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum
Samantha Hsieh
Amelia Dagen
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Ste. 701
Washington, DC 20036
(202) 331-3320

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................5

I.  The district court's acceptance of the supposed "in-sourced"
    program was a legal error that led to an erroneous ruling. ...........5

II.  Providers have standing based on both the harm to their or-
     ganizational missions and financial harm. ...................................10

III.  The Tucker Act does not apply here. ...........................................16

  A.  Section 1491(b) does not apply because Providers do not
      challenge a procurement decision. .......................................17

  B.  Section 1491(a) does not apply because Providers' claims
      do not arise from contract or seek contractual relief. .........22

IV.  The Government did not have unreviewable discretion to ter-
     minate the Programs. ....................................................................29

V.  Should proceedings in the district court continue, a prelimi-
    nary injunction is warranted. .......................................................33

CONCLUSION ...................................................................................35

# TABLE OF AUTHORITIES
## CASES

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   770 F. Supp. 3d 121 (D.D.C. 2025) .................................................... 15

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
   946 F.3d 615 (D.C. Cir. 2020) ............................................................ 10

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
   2025 WL 995428 (D. Mass. Apr. 2, 2025).......................................... 27

*Bowen v. Mich. Acad. of Fam. Physicians*,
   476 U.S. 667 (1986)................................................................ 16, 22, 26

*California v. U.S. Dep't of Educ.*,
   2025 WL 725103 (D. Mass. Mar. 6, 2025) ......................................... 27

*Center for Biological Diversity v. United States Department
   of the Interior*,
   144 F.4th 296 (D.C. Cir. 2025)........................................................... 12

*Climate United Fund v. Citibank, N.A.*,
   2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ...................................... 25

*Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of
   Health & Hum. Servs.*,
   83 F.3d 1497 (D.C. Cir. 1996) ............................................................. 8

*Ctr. for Biological Diversity v. Trump*,
   453 F. Supp. 3d 11 (D.D.C. 2020) ...................................................... 31

*Department of Education v. California*,
   145 S. Ct. 966 (2025)..................................................................... 24, 26

*Emery Worldwide Airlines, Inc. v. United States*,
   264 F.3d 1071 (Fed. Cir. 2001) .......................................................... 17

*FDA v. Alliance for Hippocratic Medicine*,
   602 U.S. 367 (2024).................................................................. 4, 11, 12

*Fisher-Cal Industs., Inc. v. United States*,
  747 F.3d 899 (D.C. Cir. 2014) ............................................................ 18

*Global Health Council v. Trump*,
  __ F.4th __, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .................. 14

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................... 10, 12

*Hi-Tech Furnace Sys., Inc. v. F.C.C.*,
  224 F.3d 781 (D.C. Cir. 2000) ............................................................ 30

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ............................................................ 13

*Impresa Construzioni Geom. Geomenico Garufi v. United States*,
  238 F.3d 1324 (Fed. Cir. 2001) .................................................... 18, 19

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
  56 F.3d 279 (D.C. Cir. 1995) ....................................................... 23, 24

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................ 32

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ..................................................................... 20, 31

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) .............................................................. 7

*Megapulse v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ..................................................... 21, 22

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ............................................................ 32

*Nairne v. Landry*,
  __ F.4th __, 2025 WL 2355524 (5th Cir. Aug. 14, 2025) ................... 13

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ............................................................ 15

iv

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*,
   606 U.S. \_\_, 2025 WL 2415669 (Aug. 21, 2025) ........................... 21, 26

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) ............................................................ 13

*Rhea Lana, Inc. v. United States*,
   925 F.3d 521 (D.C. Cir. 2019) ......................................................... 5, 6

*Rothe Dev., Inc. v. United States Dep't of Def.*,
   666 F.3d 336 (5th Cir. 2011) .............................................................. 18

*Rudometkin v. Wormuth*,
   2024 WL 5165697 (D.C. Cir. Dec. 19, 2024) .................................... 24

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ............................................................................... 5

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) ........................................................... 30

*Transactive Corp. v. United States*,
   91 F.3d 232 (D.C. Cir. 1996) ............................................................. 30

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cr. 1992) ............................................................ 22

*Vero Tech. Support, Inc. v. U.S. Dep't of Def.*,
   437 Fed. App'x 766 (11th Cir. 2011) ................................................. 18

*Widakuswara v. Lake*,
   2025 WL 1288817 (D.C. Cir. 2025) ............................................. 24, 25

## STATUTES

28 U.S.C. § 1491 ................................................... 16, 17, 18, 19, 20, 22, 28

Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-42, 138 Stat. 25, 133 (2024) .......................... 29, 31, 33

## OTHER AUTHORITIES

S. Rep. 118-62 (2023).............................................................................2, 3

# GLOSSARY

APA.............................................................Administrative Procedure Act

Custodians Program...............Legal Orientation Program for Custodians

EOIR ........................................ Executive Office for Immigration Review

The Government........................................................Defendants-Appellees

Helpdesk Program....................................... Immigration Court Helpdesk

Orientation Program ..................................... Legal Orientation Program

Programs .....................Orientation, Helpdesk, and Custodians Program

Providers....................................................................Plaintiffs-Appellants

## INTRODUCTION

Defendants-Appellees ("the Government") broke the law by terminating congressionally mandated programs. Their series of false premises in defense provide no justification. The Government says its plan had always been to "in-source" the mandated programs, AB 68–69, even though this supposed plan was never mentioned in the administrative record. The Government says Plaintiffs-Appellants ("Providers") bring "claims to enforce a contractual obligation to make funds available," *id.* at 30, even though no such claims appear anywhere in Providers' complaint. And the Government says the programs "have no content independent of" the contracts through which they had previously been provided, *id.* at 38, even though Congress spelled out the contours of the programs and told the Government to run the programs. Once these false premises are swept away, the Government's arguments—and the district court's decision to rubber-stamp the termination—collapse.

This case is about long-standing immigration-court programs that Congress supports, but the administration evidently does not. Congress has repeatedly earmarked appropriations for programs to provide legal education services to individuals in removal proceedings—including the

1

Legal Orientation Program ("Orientation Program"), Immigration Court Helpdesk ("Helpdesk Program"), and Legal Orientation Program for Custodians ("Custodians Program") (collectively, the "Programs")—and specified that the Programs "be operated by non-profit NGOs with demonstrated immigration law expertise." S. Rep. 118-62, at 85 (2023). Contravening this clear congressional directive, the Executive Office for Immigration Review ("EOIR") acted to "terminate" the Programs on April 10, 2025, without any plan for replacing them and without any explanation—not even in response to a staff member who requested a "memo in writing ASAP" explaining "why" the decision had been made. APP0222–25.

It was only after Providers filed their motion for summary judgment that the Government changed its tune and submitted a declaration insisting that it was actually "in-sourcing" the Orientation and Custodians Programs—a concept never disclosed at the time of termination and not reflected in the two administrative records the Government filed. The district court erred when it accepted this after-the-fact justification without allowing Providers to test its veracity and without a single piece of contemporaneous evidence showing that the Government considered

2

in-sourcing the Orientation and Custodians Programs at the time of termination.  The district court then wrongly reasoned that, because the Programs had allegedly been "in-sourced" rather than "terminated," Providers were bringing non-cognizable claims challenging the ongoing administration of a federalized program—rather than claims challenging the wholesale termination of those Programs.

The Government does not dispute that, by accepting this after-the-fact justification, the district court relied on "facts that were not properly part of the administrative record."  AB 66.  Yet the Government insists that does not matter because—advancing yet another false premise—it thinks "the correct outcome of this appeal does not turn on those facts," or even "whether EOIR is currently providing [Program] services at all." *Id.*  That is belied by the rest of the Government's arguments, which rely on the assumption that "EOIR has in-sourced" the Programs and that EOIR will "directly 'provide services'" as part of this supposed "in-sourced" model.  *Id.* at 36, 61.  The Government's arguments and the district court's reasoning all hinge on an improper after-the-fact justification for termination that has no basis in the administrative record and does not support the challenged decisions.

3

The Government's jurisdictional arguments fare no better. Providers have plainly demonstrated standing under *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), because the termination of the Programs directly and perceptibly interfered with their core business activities, which the district court acknowledged but ignored in its analysis. APP1180–82. Further, neither section of the Tucker Act applies here because Providers' claims do not challenge how the Government chooses to provide the mandated Programs, but instead relate to whether the Government is actually providing those Programs *at all*. Nor is the Government correct that the only "content" of the Programs came from task orders. Congress directed the Government to fund the "services and activities provided by the Legal Orientation Program," services Providers had created *before* Congress directed the Government to fund them. The courts—and not executive agencies—should interpret this statutory command and determine whether the Government is fulfilling its obligations, including as to whether the Helpdesk Program is covered. The district court's failure to do that is reversible error. Finally, because the Government has not advanced a single argument on the merits, it cannot dispute that Providers meet the standard for a preliminary injunction.

Agency decision-making is not an improvisational artform. The Administrative Procedure Act ("APA") operates to ensure that agency actions are deliberate, reasoned, and documented. The Government's "make it up as you go along" justification for terminating the Programs here was none of those things. This Court should reverse and order entry of judgment for Providers.

## ARGUMENT

## I.    The district court's acceptance of the supposed "in-sourced" program was a legal error that led to an erroneous ruling.

It is black-letter law that the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). This rule "prohibits *'ex post* supplementation of the record,'" particularly where the "post hoc materials . . . present an 'entirely new theory,' or when the contemporaneous record discloses 'no basis for the agency determination' whatsoever." *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019).

The administrative record here makes clear that the Government sought to "terminate" the programs without *any* contemporaneous explanation. APP0222. When someone requested "a memo in writing ASAP"

explaining "why" the Programs were being terminated, that request went unanswered.  APP0225.

Only in response to Providers' summary judgment motion—nearly a month after the Government terminated the Programs with no stated reasoning—did the Government first assert, by a declaration in this litigation, its purported terminated rationale.  The Government claimed no foul because it says it *actually* "in-sourced" the Programs through a new "federalized" program made up of a hodgepodge of preexisting resources and obligations.  *See* OB 43–49.  That attempt to pad the record—and, indeed, change the basis of this litigation entirely—was a prohibited "'*ex post* supplementation of the record.'"  *Rhea Lana*, 925 F.3d at 524.  The district court thus should not have considered the after-the-fact declarations at all.  At minimum, Providers should have been allowed discovery to test the Government's eleventh-hour in-sourcing revelation.  OB 49.

The Government does not challenge that the after-the-fact declarations presented "facts that were not properly part of the administrative record."  AB 66.  None of the Government's four arguments turns that improper submission into legitimate evidence.

6

*First*, the Government says the *Chenery* principle does not apply "when determining whether the court has jurisdiction or plaintiffs have a cognizable cause of action." AB 67. But the only support the Government offers is a single out-of-context quote from a case discussing the unrelated notion that agencies need not create a record through notice-and-comment rulemaking for discretionary actions. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). That case does not even discuss the *Chenery* principle, much less provide a basis to sidestep *Chenery*. AB 67.

*Second*, the Government insists its after-the-fact declarations are permissible because they supposedly "reflect the contemporaneous reasoning of" EOIR. AB 68 (cleaned up). But this post-termination wand-waving by the Government's counsel has no support; the Government does not—and cannot—cite anything in the contemporaneous record that remotely reflects the "in-sourcing" plan suggested in the post-termination declarations, which themselves do not even purport to reflect contemporaneous reasoning. *See id.* This case is thus worlds apart from *Rhea Lane*, where this Court allowed an unusual after-the-fact "recapitulation" of prior events because the declaration "echoe[d] the rationale contained

7

in the contemporaneous record." 925 F.3d at 524–25. Here, there is nothing in the contemporaneous record that supports the made-for-litigation assertions in the declarations. *See Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 83 F.3d 1497, 1507 (D.C. Cir. 1996) (rejecting a "*post hoc*" declaration that "offers an entirely new theory" for the agency action).

*Third*, the Government acknowledges that discovery is warranted in APA cases where there has been "'bad faith or improper behavior,'" but insists without explanation that "[t]his case has nothing of the sort." AB 69. That is belied by the record: the Government admitted it had "a difficult record to defend," APP0851, and supplemented that record with convenient, self-serving, contradictory, and inconsistent declarations describing a purported "federalized" program for which there is zero evidence in the contemporaneous record. The district court should have never allowed these after-the-fact declarations in the first place, but to the extent they come in, Providers should be allowed to test their truthfulness through discovery. OB 49.

*Fourth*, the Government argues that "the correct outcome of this appeal does not turn on" the facts in its declarations—"or even whether

8

EOIR is currently providing [Program] services at all." AB 66. That might be more convincing if the Government didn't repeatedly lean on those same declarations. As it stands, the Government relies on the facts in the disputed declarations to support that, among other things, "EOIR has in-sourced [Program] services," *id.* at 36, it intends to "directly 'provide [Program] services,'" *id.* at 61, and therefore this case is really about the Government's purported decision to "cease procuring services from an outside contract" and instead "provide some of those services itself," *id.* at 12–13.

The same was true of the district court's order. The district court admitted that it relied on the Government's "extra-record evidence," which came nearly a month after the challenged action, to determine the "nature of the agency actions at issue." APP1191. Only then did the court split Providers' claims into those challenging the purported "decision to in-source" the Orientation and Custodians Programs, on the one hand, and the alleged "ongoing implementation" of those Programs, on the other, while separately addressing the decision to terminate the Helpdesk Program—rather than assessing Providers' challenge to the wholesale termination of all Programs. *Id.* That decision affected the

9

whole of the district court's analysis, OB 50–53—an error the Government replicates here.  This alone warrants reversal.

## II.   Providers have standing based on both the harm to their organizational missions and financial harm.

The Government's termination of the Programs caused two independent types of harm, each of which gave rise to separate bases for standing:   harm to Providers' organizational missions and financial harm.

**Mission Harms.**  The Supreme Court and this Court have made clear that an "organization has suffered injury in fact," and therefore has standing, when a government action has "perceptibly impaired" its organizational mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020).  The Government's termination of the Programs has "perceptibly impaired" Providers' abilities to provide the services they were formed to provide—legal services for individuals in removal proceedings—directly harming their organizational missions.  OB 54–63.

The Government does not dispute that termination has impeded Providers' missions, claiming instead that this well-established means of asserting organizational standing has been "squarely rejected" by more

10

recent Supreme Court precedent.  AB 49 (citing *Alliance for Hippocratic Medicine*, 602 U.S. 367).  The Government misreads *Alliance for Hippocratic Medicine*.  That case did not overturn *Havens*, but instead reiterated the requirement that plaintiffs show "more than simply a setback to the organization's abstract social interests" and affirmed that organizations cannot "spend [their] way into standing simply by expending money to gather information and advocate against" government action to which they are ideologically opposed.  602 U.S. at 394.

Providers are nothing like the issue-advocacy organizations that served as plaintiffs in *Alliance for Hippocratic Medicine*.  As the Supreme Court noted, "[c]ritically," those plaintiffs did not also provide any services, 602 U.S. at 395—unlike both the organizations in *Havens Realty* and Providers here.  And whereas the plaintiffs in *Alliance for Hippocratic Medicine* could only point to expenditure of resources, *id.* at 394, Providers' harms sweep much broader, including real impediments to their longstanding work to provide counseling and referral services, services Providers have performed for decades, resulting in detained individuals being deprived of key legal information.  *See* OB 56–58.  This is exactly the kind of situation the Supreme Court envisioned would give

11

rise to organizational standing: government action that has "directly affected and interfered with [Providers'] core business activities." *Alliance for Hippocratic Med.*, 602 U.S. at 395.

Far from rejecting the organizational-standing test from *Havens Realty*, this Court's decision in *Center for Biological Diversity v. United States Department of the Interior*, 144 F.4th 296 (D.C. Cir. 2025), relied on *Havens Realty* for the proposition that an organization may demonstrate an injury-in-fact by alleging a concrete and demonstrable injury to its activities. *Id.* at 314–15 (citing *Havens Realty*, 455 U.S. at 379). Because the plaintiff in that case "identif[ied] no harm to its own activities apart from its advocacy," the Court held that the plaintiff lacked organizational standing. *Id.* at 315. But, contrary to the Government's suggestion, this Court's application of *Havens Realty* suggests that the Court certainly did not lack any opportunity to "specifically consider whether the framework identified in those precedents can be reconciled with *Alliance for Hippocratic Medicine.*" AB 53.

Other courts of appeal have reaffirmed that, following *Alliance for Hippocratic Medicine*, standing can still be established where a defendant's actions interfere with a plaintiff organization's mission and force

12

the organization to divert resources to mitigate that interference. *See e.g.*, *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 987–88 (9th Cir. 2025) ("*Hippocratic Medicine* . . . reinforced the holding in *Havens Realty*" and "reiterated that when a defendant's actions 'directly affect[] and interfere[] with' a plaintiff's 'core business activities,' then the plaintiff may assert organizational standing."); *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396-97 (4th Cir. 2024) (applying *Havens Realty* and *Alliance for Hippocratic Medicine* to find that plaintiffs established organizational standing because "Defendants' actions and inaction" directly impact[ed] plaintiffs' core organizational missions of election security and provider voter services"); *Nairne v. Landry*, __ F.4th __, 2025 WL 2355524, at *5 (5th Cir. Aug. 14, 2025) (applying *Havens Realty* and *Alliance for Hippocratic Medicine* to find that plaintiffs established organizational standing because they were "forced to reallocate staff and launch new initiatives to mitigate the effects" of defendants' actions). This Court should do the same.

Organizational standing continues to have broad recognition in case law. And Providers, who have evidenced the substantial harms to

their organizational missions due to the Government's actions, have demonstrated why it applies here.

**Funding Harms.** The Government's termination of the Programs both cut off Providers' access to funds and required them to spend additional money to fill the gaps caused by the Government's cessation of Program services. OB 64–66; APP0399; APP0409; APP0500; APP0513. This harm was directly caused by the Government's actions and provides an independent basis for standing.

The Government's only substantive response is to claim that Providers' harm is "not traceable" to the agency action because the inadequacies of EOIR's "in sourced" services are supposedly "wholly disconnected from [Providers'] complaints." AB 54–56. But Providers' injuries—specifically, their loss of ability to ensure individuals in removal proceedings are educated about their rights and responsibilities and the need to spend more money on these services now that the Government is not funding them in any form—not only can be traced to, but flow directly from the Government's termination of the Programs. *See Global Health Council v. Trump*, __ F.4th __, 2025 WL 2480618, at *5 (D.C. Cir. Aug.

14

28, 2025) (affirming plaintiffs had standing due to financial harms caused by grant terminations).

Moreover, the court could easily redress those harms by ordering the Government to run the Programs as Congress mandated.  Even if Providers are not the ones who provide the services, if the required services were provided to individuals whom Providers were formed to serve, the Providers would not have to divert resources from their other initiatives.  The Government and district court ignore that Providers are in the untenable position of either cancelling longstanding services with no viable alternative in place or stretching their resources to the limit to continue to provide services despite a significant funding loss.  Because none of those services are being offered, and the need for those services has increased, the withdrawn funding "directly affect[s] [Providers'] pocketbook and their ability to fulfill their organizational missions," which is "textbook injury, causation, and redress."  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 134 (D.D.C. 2025), *vacated on other grounds*, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025); *see also Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 829

(D.C. Cir. 2006) ("An actual withdrawal of funding from the [organization] would clearly qualify" to show injury in fact).

## III.  The Tucker Act does not apply here.

The district court had jurisdiction over Providers' non-contractual, non-procurement claims, which challenge the Government's unlawful decision to terminate the congressionally mandated Programs (as opposed to any contracting or procurement decision) and seek restoration of the Programs (as opposed to money or any contract remedy).  The Government invokes the Tucker Act's two narrow exceptions to the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).  The district court wrongly concluded that the Tucker Act's procurement provisions barred review of the alleged in-sourcing of the Orientation and Custodians Programs.  Because Providers are challenging the termination of the Programs—not a procurement decision (28 U.S.C. § 1491(b)) or a contract decision (28 U.S.C. § 1491(a))—neither exception applies. The Government's contrary arguments rely on a mischaracterization of Providers' claims.

16

**A.    Section 1491(b) does not apply because Providers do not challenge a procurement decision.**

Section 1491(b) expresses Congress's intent "to vest a single judicial tribunal"—the Court of Federal Claims—"with exclusive jurisdiction to review government contract protest actions." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001). Under that provision, the Court of Federal Claims has exclusive jurisdiction over bid protests (1) brought by an "interested party" and (2) challenging "any alleged violation of statute or regulation in connection with a *procurement*" decision. 28 U.S.C. § 1491(b)(1) (emphasis added).

The Government, for the first time on appeal, advances a novel, expansive view of section 1491(b) without a single supporting case, going beyond even the district court's erroneous application of section 1491(b). According to the Government, section 1491(b) applies any time the Government opts to use a contract as a vehicle to implement a congressionally mandated program. AB 37–39. This is nonsense. The Tucker Act provides a common tribunal to resolve contractual claims for monetary damages against the Government. It does not give the Government carte blanche to disregard clear statutory commands and avoid the threat of declaratory or injunctive relief for misconduct. As far as Providers are

17

aware, no court has applied section 1491(b) to claims, like Providers', that challenge the termination of congressionally mandated programs and are agnostic to *how* the Government effectuates this termination—whether by cancelling contracts or phantom "in-sourcing." *See* OB 36 (noting lack of evidence of any alternative programming).

The case law—including every in-sourcing case Providers are aware of—paints a clear picture: section 1491(b) gives the Court of Federal Claims exclusive jurisdiction over claims alleging violations of procurement regulations, but it does not swallow the APA. *See, e.g.*, *Fisher-Cal Industs., Inc. v. United States*, 747 F.3d 899, 900 (D.C. Cir. 2014) (section applied to claims for failure to conduct cost analysis violated procurement regulations); *Rothe Dev., Inc. v. United States Dep't of Def.*, 666 F.3d 336, 338 (5th Cir. 2011) (alleging violations of "procurement procedures"); *Vero Tech. Support, Inc. v. U.S. Dep't of Def.*, 437 Fed. App'x 766, 770 (11th Cir. 2011) (same).

The Government cites only one case in arguing that section 1491(b) also applies to claims not challenging violations of procurement statutes. AB 38 (citing *Impresa Construzioni Geom. Geomenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001)). Although *Impresa* was, by the

court's own admission, "a most unusual case," it ultimately involved a "post-award bid protest[]" in which would-be contractors claimed a contracting officer violated the APA. *Impresa Construzioni*, 238 F.3d at 1329–30, 1341. The plaintiffs alleged that a government officer violated a specific federal contracting regulation by awarding the contract to an entity which a court had previously found was connected to mafia-related "bid-rigging" and the alleged assassination of a competing bidder. *Id.* at 1329 (2001). In other words, the Government's sole authority is a case involving a procurement officer's procurement decision under a procurement regulation. This merely proves Providers' point: because there is no procurement connection to Providers' claims here, section 1491(b) does not apply.

Unable to find support in case law, the Government mischaracterizes Providers' claims to attempt to fit them under section 1491(b). The Government says Providers "attempt to challenge EOIR's actions in terminating *the task orders*" and in-sourcing the Orientation and Custodians Programs. AB 36 (emphasis added). But Providers' *actual* claims do not stem from the task orders at all. Instead, they challenge the Government's decision to unlawfully terminate *the Programs* without a viable

19

replacement plan in violation of the APA and congressional appropriation commands. That is nothing like a "bid protest" covered by section 1491(b). The district court's application of section 1491(b) to Providers' claims was a novel, unsupported application of the statute beyond the procurement decisions it was meant to cover.

The Government also claims power to ignore congressional commands, saying Providers' challenge to the decision to terminate the Programs must be a contractual challenge because the Programs "have no content independent" of the task orders the Government has historically used to provide the Programs. AB 38. But the task orders are merely the tool the Government has used to obey Congress's command to run the Programs. Congress has repeatedly given the Programs "independent content" by dictating how they must be structured and operated. *See* OB 22–25. The Government's insistence that only EOIR gives these congressional dictates "content" is antithetical to the Supreme Court's command that courts—not agencies—resolve what Congress means. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024). It also defies the facts, as the Providers performed these services for years before any

20

such task orders existed, OB 20, and the Government itself suggests it can provide these services in an alternative manner, AB 38.

Allowing the Government to recast any decision to terminate a congressionally mandated program as a procurement decision would effectively render the APA a dead-letter in this context. The Supreme Court has recently rejected such a broad reading of the Tucker Act. *See Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL 2415669, at *2 (Aug. 21, 2025) (Barrett, J., concurring). Here, the Government argues for broad immunity from district court review—and, thus, from injunctions against its actions, as the Court of Federal Claims cannot issue such relief, *see Megapulse v. Lewis*, 672 F.2d 959, 963 n.13 (D.C. Cir. 1982)—for any determination that there is "no need" to spend appropriated funds as Congress directed. AB 36–37. This is a pointed assault on the separation of powers and Congress's power of the purse. Accepting this position would open a contract loophole that would allow the executive to cancel programs even if cancellation defied the APA and congressional commands.

**B.    Section 1491(a) does not apply because Providers'
claims do not arise from contract or seek contractual
relief.**

The district court correctly held that section 1491(a) did not deprive
the court of jurisdiction over Providers' claims that "challeng[e] the law-
fulness of [the Government's] wholesale termination of these programs
under the APA."  APP1197.  This Court applies a two-pronged test to
determine whether section 1491(a) applies, asking whether the claim
(1) arises from a contract and (2) seeks a contractual remedy.  *Megapulse*,
672 F.2d at 968.  Neither prong applies to Providers' claims.

*First*, Providers' claims do not arise from contract because the court
"need not examine" any contract to decide the claims, and instead "must
interpret the APA and relevant appropriations."  APP1197 (cleaned up);
*see Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598,
609 (D.C. Cr. 1992), *abrogated on other grounds*, (section 1491(a) does not
apply to claims that "despite the presence of a contract . . . stem from a
statute or the Constitution").

*Second*, the APA applies to claims seeking "declaratory and injunc-
tive relief," not to claims seeking "money in compensation for [] losses" or
other contractual relief, to which section 1491(a) applies.  *Bowen*, 487 U.S.

22

at 893, 895.  As the district court correctly recognized, the second prong of the *Megapulse* test does not apply because Providers' requested relief "does not include the payment of any sum or the enforcement of any contractual provision."  APP1197.

To resist this conclusion, the Government again mischaracterizes Providers' claims as seeking "continued payment of funds" under a contract to attempt to meet the first prong of the *Megapulse* test.  AB 43. Providers bring no such claims, instead seeking an order requiring the Government to comply with its *statutory commands to continue the Programs*.  OB 74–75.  As to the second prong, the Government also insists that the distinction the Supreme Court and this Court recognize between contractual and non-contractual relief is "nonsensical."  AB 47.  But the Government cannot simply wave away controlling precedent that establishes that distinction as significant, *see Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995)—precedent the Government itself relied upon below to argue (incorrectly) that the relief Providers seek is contractual relief.  *Compare* APP0615–19 (Government brief relying on *Kidwell*), *with* AB 47–48 (Government arguing *Kidwell* does not concern the Tucker Act).

23

As this Court recently affirmed, when applying the second *Megapulse* prong, district courts should be "guided by our case law that has identified the 'explicitly contractual remedy' of specific performance and the 'prototypical contract remedy' of money damages as types of relief that are 'specific to actions that sound in contract.'" *Crowley*, 38 F.4th at 1107. Notwithstanding the Government's about-face on the governing standard, *Kidwell* plainly addresses whether the relief sought by a party is covered by the Tucker Act. 56 F.3d at 283. And this Court has repeatedly cited that decision as providing the governing test for the second prong of the *Megapulse* test. *See, e.g.*, *Widakuswara v. Lake*, 2025 WL 1288817, at \*13–14 (D.C. Cir. 2025) (Pillard, J., dissenting), (citing *Kidwell* for the relevant test), *vacated en banc*, 2025 WL 1521355, at \*1 (adopting Judge Pillard's reasoning); *Rudometkin v. Wormuth*, 2024 WL 5165697, at \*2 (D.C. Cir. Dec. 19, 2024); *Crowley*, 38 F.4th at 1107–08.

Neither *Department of Education v. California*, 145 S. Ct. 966 (2025), nor *National Institutes of Health* "change the landscape" or dictate application of the Tucker Act here. *Widakuswara*, 2025 WL 1288817, at \*13–14 (Pillard, J., dissenting). The opinion from Judge Pillard endorsed by this Court en banc in *Widakuswara* is directly on point, holding

the Tucker Act did not apply to claims that—like Providers'—at their "core … challenge[] the government's assertion that it may disregard specific congressional funding directives," turn on "statutes and regulations rather than the terms of an agreement," and depend on whether the Government's actions "were unlawful in the face of federal statutes appropriating funds for specific purposes," like running the Programs in a specific form. *Widakuswara*, 2025 WL 1288817, at *10–14. The Government's attempt to distinguish *Widakuswara* as turning on a specific statute that entitled the Plaintiffs to funding, AB 46–47, reads the case too narrowly: *Widakuswara* emphasized that this was just one example of how the claims challenged violations of law, not of contract. 2025 WL 1288817, at *11. Where this Court has departed from this conclusion, it was because the plaintiffs explicitly sought recoupment of money they said they were owed. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 2502881, at *6 (D.C. Cir. Sept. 2, 2025).

Both of the Supreme Court's recent decisions endorse the case law *Widakuswara* relied on, affirming that a district court's jurisdiction turns not on whether "an order setting aside an agency's action may result in the disbursement of funds" but instead on whether the claims seek "to

25

enforce a contractual obligation to pay money." *Dept. of Educ.*, 145 S. Ct. 966, 968–69 (citing *Bowen*, 487 U.S. at 910). And both decisions concluded the Tucker Act applied because of facts not present in this case, as both sets of plaintiffs sought an order forcing payment under a contract. *Dep't of Educ.*, 145 S.Ct. at 968; *Nat'l Insts. of Health*, 2025 WL 2415669, at *1. *National Institutes of Health* makes clear Providers' claims are properly heard in district court; as Justice Barrett explained, the mere fact that a policy is "related to grants does not transform a challenge to that [policy] into a claim 'founded . . . upon' contract." 2025 WL 2415669, at *2 (Barrett, J., concurring). Here, Providers (1) do not have a contract with the Government under which they could enforce any payment obligation, and (2) do not seek an order requiring the Government to pay them money. *See, e.g.*, APP1053, 1101–02.

The Government also claims *Department of Education* and *National Institutes of Health* are analogous because the relevant contract with Acacia Center of Justice here was purportedly "awarded . . . from a generalized appropriation," so Providers' "purported rights to payment" can only come from the Acacia contract. AB 43. This is wrong. As an

initial matter, the appropriation for the Programs is not a lump-sum appropriation—it explicitly requires the Government to fund "the services and activities provided by the Legal Orientation Program." *See infra* Section IV.

More importantly, Providers do not assert any "purported rights to payment." AB 43. This argument relies on the Government's persistent mischaracterization of Providers' claims, which allege violations of the APA, appropriations laws, and the Constitution—not a breach of any contract. *See* OB 66–75. Nor do Providers' claims rely on any right to continued funding. They challenge the decision to terminate the Programs, not to stop paying money that was ultimately distributed to Providers. Providers seek to set aside the termination of the Programs—regardless of whether that results in Providers being paid a single cent. *See supra* Section II. By contrast, the plaintiffs in *Department of Education* and *National Institutes of Health* explicitly sought an order reinstating their specific grants. *See* Compl., *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 995428 (D. Mass. Apr. 2, 2025); Compl., *California v. U.S. Dep't of Educ.*, 2025 WL 725103 (D. Mass. Mar. 6, 2025).

The Government's other analogies similarly fail to account for the factual differences here. *See* AB 45–46. For example, the plaintiffs in *Spectrum Leasing Corp. v. United States* sought "an order compelling the government pay money owed in exchange for goods procured under an executory contract"—a "classic contractual remedy." 764 F.2d 891 at 892–94 (D.C. Cir. 1985). Because the plaintiffs alleged violation of a statute that provided only "procedural requirements" that applied to the government's decision to withhold payment under the contract, the court determined that their claims turned on a claimed right to payment under the contract. *Id.* at 892–95. Providers seek no such relief here.

Similarly, in *Ingersoll-Rand Co. v. United States*, the plaintiffs claimed a contract termination violated contracting regulations incorporated in part in the contract, and sought reinstatement and performance of the contract. 780 F.2d 74, 77-80 (D.C. Cir. 1985). Again, Providers do not seek that remedy.

The Government has not identified any truly analogous case to support its position. To apply section 1491(a) here as the Government asks would upend longstanding precedent and improperly expand the Tucker Act's limited scope.

28

## IV.  The Government did not have unreviewable discretion to terminate the Programs.

Congress earmarked no less than $28 million "for services and activities provided by the Legal Orientation Program."  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 133 (2024).  This language clearly encompasses the Orientation, Custodians, and Helpdesk Programs, as the Government recognized below.  APP0628 ("LOP, LOPC, and ICH are funded through . . . targeted appropriations, and the corresponding appropriations statutes set a minimum amount of funding that must be collectively allocated to the three programs.").

The district court erroneously reasoned that this congressional command did not have any teeth with respect to the Helpdesk Program—a ruling that gave too much deference to the agencies and ignored the court's own obligation to interpret Congress's dictates.  OB 76–82.  The Government doubles down on this error, going further to argue that it has sole discretion to decide whether it funds *any* of the Programs.  AB 56–57.  Not so.  Congress required, in law, that the Government "shall" fund the "services and activities provided by the Legal Orientation Program," which, properly understood, plainly include the Orientation,

Custodians, and Helpdesk Programs.  OB 77–78.  Although the Government may retain some discretion in precisely *how* to allocate these funds between these programs, it does not have the discretion to stop funding them altogether, and there are sufficiently reviewable standards to allow a court to review whether the Government is funding these services and activities as required.

Agency decisions are "presumptively subject to judicial review unless . . . the 'action is committed to agency discretion by law.'" *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).  This rare exception is unavailable when there is "law to apply."  OB 76–77; *see also Hi-Tech Furnace Sys., Inc. v. F.C.C.*, 224 F.3d 781, 788 (D.C. Cir. 2000) ("The exception . . . is a 'very narrow' one, reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'").  In applying this exception, this Court considers "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011).

Here, these factors favor reviewing the Government's action.  First, the Government's action is the termination of the Programs with no plan to replace them; even the purported federalized programs lack any substance or contemporaneous evidence to support them.  Second, Congress has expressly mandated in the appropriations statute that the Government must provide these Programs.  The language of the statute is not discretionary; instead, it provides that $28 million "*shall* be available" for these services and activities.  138 Stat. at 133 (emphasis added).  The Government's contrary argument reads the Legal Orientation Program earmark out of the statute entirely.

Further, determining whether the Helpdesk Program is part of the "services and activities provided by the Legal Orientation Program," OB 80, is not something left to agency discretion but instead "a simple matter of statutory interpretation, something that is well within the judiciary's competence," *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 37 (D.D.C. 2020); *see also Loper Bright*, 603 U.S. at 373 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").  Contrary to the Government's characterization, Providers do not simply ask this Court to enforce legislative history as part of the

statute. Instead, Providers ask this Court to interpret the plain language of the statute, which encompassed the Helpdesk Program at the time it was passed. OB 77–78. The Government offers no contrary construction of this statute, instead insisting that despite its mandatory language, it grants the Government unreviewable discretion.

*Lincoln v. Vigil*, 508 U.S. 182 (1993), does not change this conclusion. First, *Lincoln* is inapplicable to the earmarked appropriation as that case involved an agency reallocating funds from a "lump-sum appropriation." 508 U.S. at 185. Here, the Helpdesk Program was funded through an "earmarked appropriation"—the only issue is whether the earmarked appropriation's language encompasses the Helpdesk Program. APP1173; APP1082. As Providers explained, it plainly does.

Second, in *Lincoln*, the lump-sum appropriation "contained no restrictions on use of the funds," *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), as long as the agency spent the funds "for the benefit, care, and assistance of the [recipients]" and "mental health care, and specifically for 'therapeutic and residential treatment centers,'" 508 U.S. at 185. The relevant statutes did not impose restrictions on how the ultimate recipients of the programs were served. *Id*.

32

Here, in contrast, Congress has expressly mandated that the funds be spent on specific services and activities.  138 Stat. at 133.  Congress did not authorize or grant discretion to the Government to terminate or discontinue the Helpdesk Program.  The district court therefore erred in holding that Helpdesk Program termination was unreviewable.  Providers' challenge fits squarely within the APA.

## V.    Should proceedings in the district court continue, a preliminary injunction is warranted.

If this Court agrees that the Government's termination of the Programs was unlawful and its jurisdictional arguments fail, the remedy here is clear:  reverse and remand to the district court with instructions to enter judgment for Providers.  The Government's only argument to the contrary—that Providers supposedly have not "meaningfully develop[ed] any argument on the merits"—is belied not only by the substantial ink already spilled on topic but the Government's own concession that it could not defend this record below.  *E.g.*, OB 16, 33–36, 49, 52–53, 83.

Nevertheless, if this Court believes further proceedings or discovery are warranted, it should direct the district court to enter a preliminary injunction in the meantime to halt further harm to Providers and their operations.  OB 82–83.  Such relief is warranted because Providers are

likely to succeed on the merits, *see, e.g.*, *id.* at 62, 65–66; are suffering irreparable harm to their missions and operations, *id.* at 33–36, 83; and the balance of the equities favors an injunction that would end that unlawful government action, *id.* at 83.

The sum total of the Government's response is a single sentence claiming Providers do not "fully develop" arguments for an injunction. AB 70. But the Government does not address *any* of Providers' arguments or declarations explaining why an injunction is warranted, OB 82–83—much less "fully develop" any response. The Government's unexplained protests do not provide grounds to ignore Providers' record submissions or hold back from directing the district court to enter judgment in Providers' favor or, in the alternative, directing the district court to enter a preliminary injunction pending further proceedings.

## CONCLUSION

Providers respectfully request that the Court reverse and remand with instructions to enter judgment for Providers. Alternatively, Providers request remand with instructions to grant a preliminary injunction and allow Providers to conduct discovery.

Date: September 8, 2025                    Respectfully submitted,

/s/ *Laura M. Sturges*                    /s/ *Adina Appelbaum*

GIBSON, DUNN & CRUTCHER LLP          AMICA CENTER FOR IMMIGRANT RIGHTS

Amer S. Ahmed                              Adina Appelbaum
Richard W. Mark                            Samantha Hsieh
200 Park Avenue                            Amelia Dagen
New York, NY 10166-0193                    Amica Center for Immigrant
(212) 351-4000                             Rights
aahmed@gibsondunn.com                      1025 Connecticut Avenue NW,
rmark@gibsondunn.com                       Suite 701
                                           Washington, DC 20036
Laura M. Sturges                           (202) 331-3320
Caelin Moriarity Miltko                    adina@amicacenter.org
1900 Lawrence Street, Suite                sam@amicacenter.org
3000                                       amelia@amicacenter.org
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com
cmoriaritymiltko@gibson-                   *Attorneys for Plaintiffs-Appellants*
dunn.com

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed R. App. P. 32(a)(7) and D.C. Cir. R. 28(c) because this brief contains 6,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this opposition has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font.

*/s/  Laura M. Sturges*
Laura M. Sturges
GIBSON, DUNN & CRUTCHER LLP

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 8, 2025, I electronically filed the foregoing Plaintiffs-Appellants' Reply Brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Date:  September 8, 2025                    Respectfully submitted,

                                            */s/  Laura M. Sturges*
                                            Laura M. Sturges
                                            GIBSON, DUNN & CRUTCHER LLP

                                            *Counsel for Plaintiffs-Appellants*